PAN–AMERICAN LIFE INSURANCE COMPANY; and National Insurance Services, Inc., Appellants,

v.

Stephan ROETHKE, Appellee.

and

Stephan Roethke; and Commonwealth of Kentucky, Cabinet for Human Resources, Cross–Appellants.

v.

Pan–American Life Insurance Company; and National Insurance Services, Inc. Cross–Appellees.

No. 1997–SC–0433–DG, 1997–SC–1087–DG.

Supreme Court of Kentucky.

Aug. 24, 2000.

Rehearing Denied Nov. 22, 2000.

Robert M. Brooks, Martin A. Little, Boehl, Stopher & Graves, Louisville, for Appellants/Cross–Appellees.

Kenneth H. Baker, James S. Scroghan, Baker and Scroghan, Louisville, for Appellees/Cross–Appellants.

STUMBO, Justice.

The issue presented in this case is whether Appellants could be held vicariously liable for the alleged misrepresentations and negligence of their agent. The trial court granted summary judgment in favor of Appellants. The Court of Appeals reversed, finding this was a question for the jury to determine. We affirm.

D & B Roofing, Inc., is owned and operated by Appellee/Cross–Appellant, Stephan Roethke, and his wife Karen. Stephan is the president and Karen is the secretary/treasurer. In January 1992, Karen, on behalf of D & B, purchased individual health insurance coverage for

one of D & B's employees through Joe Maresca. In April 1992, Karen, on behalf of D & B, purchased two more individual health insurance policies through Maresca. Physician's Mutual was the insurer on these three policies and Maresca, at the time, was an agent for Physician's Mutual. These three policies covered work-related injuries and illnesses, which was important to the Roethkes because both of them had previously rejected coverage under the Kentucky Worker's Compensation Act.

In July 1992, Karen and Maresca began discussing the possibility of obtaining group coverage for D & B's employees. Maresca told Karen that D & B could get better benefits, more coverage, and lower premiums with a group health policy. Karen testified that it was Maresca's urgings that better coverage could be obtained more cheaply that led her to consider switching to group health coverage. On August 17, 1992, Maresca completed an "Application and Subscription Agreement" for group health coverage with Appellant, Pan–American Life Insurance Company ("PALIC").[1] Karen signed the application and was present when Maresca filled it out.

The PALIC group policy did not automatically cover work-related injuries and illnesses, while the individual policies with Physician's Mutual did. Rather, this coverage was optional under the PALIC policy. Section V, entitled "Benefits Desired," of the application that Maresca filled out and Karen signed, included the following paragraph:

> Occupational Coverage: Available if Worker's Compensation coverage not required by state law.
>
> _We elect 24–hour Occupational Coverage and agree to pay additional premiums required for the following individuals:
>
> Rates based on Industry Code ____

1. Appellant, National Insurance Services, Inc. ("NIS"), is a wholly owned subsidiary of PAL-IC and the administrator of the insurance policy.

The blank following this optional coverage was marked "None."

Karen testified that during her meeting with Maresca in regard to the application, she was not notified that coverage for work-related injuries was optional and obtainable only by purchasing a rider. She also testified that the list of quotes for group coverage did not have any separate notation for occupational or work-related coverage. She stated that the prior, Physician's Mutual policy did not require a rider, and that she believed the new policy "gave me exactly what the other policy did because he (Maresca) told me this is gonna be better." Karen also testified that "I did not know what occupational coverage was." Because the existing policies provided coverage for work-related injuries and illnesses and she believed that "he was just trying to sell me another gimmick," Karen admits that she interrupted Maresca when he asked her if she wanted occupational coverage.

The agreement that Maresca had with National Insurances Services, Inc., specifically provided as follows:

> If this application is approved and I receive a license to represent any insurance company on whose behalf ... (NIS) markets or administers business ... I understand that I will act as an independent contractor, not an employee or agent of NIS or any insurance company NIS represents.... As acknowledgment of my responsibility to each person to be insured through any coverage marketed or administered by NIS, I agree to fully explain to such persons all benefits, limitations and exclusions that pertain to any coverage I solicit. This explanation will occur prior to or concurrently with the solicitation and completion of any required individual enrollment material.

Also of importance in the decision of this case is language found in the application signed by Karen and completed by Maresca:

> [T]he licensed broker who solicited this Application and Subscription Agreement ... was acting as an Independent Contractor and not as a Broker of PALIC or NIS. Furthermore, the person who solicited this Agreement or upon whose explanation of coverages and benefits we relied is in fact our Broker for purposes of this Agreement. We understand as an Independent Contractor and as our Broker that person has no right to bind this coverage, or to alter terms or conditions of any Policies or any Enrollment Card or to waive any requirements of PALIC or NIS, or to adjust any claims for benefits under this insurance for which we are applying.

On December 28, 1992, Stephan was rendered a quadriplegic when he fell through a roof during an onsite inspection at a D & B Roofing Company job. PALIC denied Stephan medical benefits because his injuries were work-related.

Stephan filed suit against PALIC, NIS, and Maresca. In the suit, he alleged: 1) that PALIC and NIS are in breach of contract for denying payment of medical expenses incurred due to the fall; 2) that PALIC and NIS were negligent in their training and selection of Maresca as their agent; 3) that Maresca "made misrepresentations" and "fraudulently concealed facts" from D & B which induced D & B to obtain group health coverage from PALIC; 4) that PALIC and NIS are vicariously liable for Maresca's negligent acts; and 5) that PALIC and NIS have violated the Consumer Protection Act and the Unfair Claims Settlement Practices Act. The Cabinet for Human Resources intervened to recoup expenses it had incurred on behalf of Stephan.

The trial court granted summary judgment to PALIC and NIS, finding that even if Maresca misrepresented the terms of the new policy, he had no authority to bind PALIC or NIS or impose liability upon

those entities for any risk not covered by the terms of the policy, based upon his limited liability. The Court of Appeals reversed, holding that because the circuit court correctly held that Maresca's authority was that of an agent, liability for his acts could be imputed to PALIC if the jury found sufficient evidence that the agent made affirmative misrepresentations about the coverage. The Court of Appeals further held, however, that there was no cause of action against the two companies for failure to properly train Maresca, or for negligence in selecting Maresca as an agent. Though argued here, Roethke did not get a ruling from the Court of Appeals on the issues of whether the trial court erred in dismissing the claims under the Consumer Protection and Unfair Claims Settlement Acts, and thus those issues will not be addressed here.

■ The basic question to be answered here is whether Maresca acted as agent for PALIC in the transaction with Karen, and, if he was PALIC's agent, whether he acted within the authority granted to him by his principal. If he did both, then the question becomes whether there is sufficient evidence to present the jury with the question of whether he misrepresented the coverage he offered and thus misled the Roethkes to their detriment.

An agent is defined under Kentucky law as follows:

> An "agent" is an individual, firm, ... [or] corporation ... appointed by an insurer to solicit applications for insurance or annuity contracts or to negotiate insurance or annuity contracts on its behalf, and if authorized to do so by the insurer, to effectuate and countersign insurance contracts.

KRS 304.9–020. The liability of a company for the acts of its agent is set forth in KRS 304.9–035, which provides as follows:

> Any insurance company shall be liable for the acts of its agents when the agents are acting in their capacity as representatives of the insurance company and are acting within the scope of their authority.

The previously-quoted agency agreement NIS had with Maresca, as well as the aforementioned statement in the application for insurance executed by Karen, are relied upon by PALIC to avoid the effect of the above statutes, which have never been authoritatively construed by this Court.

Kentucky statutory and case law have historically provided that anyone who solicited and received applications for insurance on behalf of an insurance company was an agent of the company "anything in the policy or application to the contrary notwithstanding." Ky. St. § 633. *See Mutual Ben. Health & Accident Ass'n v. Smith,* Ky., 257 Ky. 288, 77 S.W.2d 957, 959 (1934); *Kentucky Macaroni Co. v. London & Provincial Marine & General Ins. Co.,* 83 F.2d 126, 128 (6th Cir.1936). Many jurisdictions have likewise enacted laws making an insurance intermediary the agent of an insurance company for whom it solicits business. The need for such statutes is expressed in L. Russ and T. Segalla, *Couch on Insurance,* § 47:29 (3rd ed.1995):

> The general purpose of the statutes is to prevent an insurer from denying responsibility for the representations and actions of an agent from whom applications are voluntarily accepted and to protect an applicant who relies on such representations or actions.

In *Motorists Mut. Ins. Co. v. Richmond,* Ky.App., 676 S.W.2d 478 (1984), the Court of Appeals expressed similar sentiments regarding the need to protect consumers from insurers who, in drafting contracts of adhesion, attempt to exculpate themselves from liability for the mistakes of those who market their product. Therein, the court stated:

> Few persons understand insurance who have not made it a special study. The agent who comes to get the insurance is the only person they deal with or know in the transaction. The rule

that he represents the company and not the insured in taking the application is just and is generally recognized.

*Id.* at 481.

The trial court determined that Maresca was an agent for PALIC in soliciting D & B's application for the group health insurance contract. The plain language of KRS 304.9–020 and the concern expressed in our case law for the need to protect insureds from overreaching supports this finding. *See Wright's Adm'r v. Northwestern Mut. Life Ins. Co.,* Ky., 91 Ky. 208, 15 S.W. 242 (1891). PALIC's attempts to avoid the principal-agent relationship by providing otherwise in its agreement with Maresca and in the application for insurance are of no avail as the statute overrides any conflicting provisions. We agree with Roethke and the trial court that, for the purpose of the transaction at issue, Maresca was the agent of PALIC.

■ KRS 304.9–035 and settled principles of agency law provide that an insurer, as principal, is liable for the acts of its agents acting within the scope of their authority. *Motorists Mutual,* 676 S.W.2d at 481. *See also Couch on Insurance, supra,* § 26A:265 at 506 (2d rev. ed.1984). While we agree with the trial court's observation that the agency statutes do not determine the scope of an agent's authority, we believe the trial court erred in concluding Maresca was not acting within the scope of his authority when he allegedly misrepresented the coverage of the group policy to Karen. It is abundantly clear to us that Maresca was acting within the scope of his authority when he allegedly induced Karen to change her health insurance coverage from Physician's Mutual to PALIC, by misrepresenting the extent of coverage contained in the latter's policy. The NIS contract appointing Maresca to transact business gave him actual authority to "fully explain" to all potential customers the "benefits, limitations and exclusions" pertaining to coverage in the plans marketed. Indeed without such authority, it would be difficult to sell the product.

■ It is not necessary for Roethke to show that PALIC instructed Maresca to misrepresent the coverage in order to establish that Maresca was acting within the scope of his authority.

> [T]he proper question is not whether the principal authorized the specific wrongful act; if that were the case, principals would seldom be liable for their agents' misconduct. Rather, the proper inquiry is whether the agent was acting within the scope of the agency relationship[.]

*Celtic Life Ins. Co. v. Coats,* 885 S.W.2d 96, 99 (Texas 1994).

In *Celtic Life* the soliciting agent represented to the owner of a business that Celtic Life Insurance Company could provide group health insurance with better coverage for psychiatric illnesses than his current policy. When payment for a psychiatric hospitalization was needed, the insured discovered there was a $10,000 limit, an amount far less than the one million dollar figure represented by the agent. The same arguments presented here by PALIC were made in *Celtic,* that is, that the agent's misrepresentations could not impose liability on the insurer for risks not covered by the written contract because the insured knew that the agent did not have the authority to bind the company. *Id.* The Texas court held the insured was able to recover because the conduct of the insurer's agent was the cause of the damage, since the inferior coverage would not have been purchased absent the agent's misrepresentation.

■ As noted by the Court of Appeals below, this holding does not make the insurer absolutely liable for the agent, relieving the agent of responsibility. It is only liable when the agent acts within the scope of his authority, the insured reasonably relies upon that act, and the reliance constitutes the cause of the insured's damage. *Grigsby v. Mountain Valley Ins.*

*Agency, Inc.,* Ky., 795 S.W.2d 372 (1990). Additionally, Maresca remains liable for his own tortious conduct, and there is nothing in the record that would prevent PALIC from seeking indemnity from its agent. *Carr v. Barnett,* Ky.App., 580 S.W.2d 237, 240 (1979).

■■■ This is a case in which affirmative misrepresentations about coverage are alleged, not simply the failure to advise a potential insured about optional coverages. *See Mullins v. Commonwealth Life Ins. Co.,* Ky., 839 S.W.2d 245 (1992). PALIC assumed the risk that its appointed agent might misrepresent the coverages it offered—the provision of written material that pointed out the policy's exclusion of work-related events does not discharge the agent's duty. As noted in *Grigsby, supra:*

> In other words, the insured's failure to read and comprehend the policy has no legal effect: it may not serve as a sword for the insured nor as a shield for the agency. This is true whether the underlying claim is for contract reformation or recovery based upon negligence of the agency.

*Grigsby,* 795 S.W.2d at 374. Maresca was not only authorized but agreed "to fully explain to [Karen] all benefits, limitations and exclusions that pertain to [the] coverage [he] solicit[ed]." According to Karen, he attempted to accomplish this by representing to her that the new group coverage was "gonna be better" than the existing individual coverage that provided coverage for work-related injuries and illnesses. Whether Maresca was prevented by Karen from fully explaining the coverage of the group policy is a factual issue for the jury to resolve in determining if he misrepresented the coverage to her. Maresca's alleged affirmative statement created a material issue of fact to be resolved by the jury and summary judgment was, therefore, inappropriate.

■■■ Finally, like the Court of Appeals, we can find no authority which requires an insurer to train its soliciting agents. Although it would greatly benefit insurers to train their agents well so as to avoid the type of claim presented here, no such legal duty to train exists. Furthermore, we agree that NIS cannot be held liable for the negligent selection of Maresca, because Maresca was duly licensed by the state. Any liability owed to Roethke by PALIC would be imposed vicariously.

We affirm the opinion of the Court of Appeals and remand this matter for proceedings consistent with this opinion.

LAMBERT, C.J.; and KELLER and WINTERSHEIMER, JJ., concur.

COOPER, J., dissents by separate opinion, in which GRAVES and JOHNSTONE, JJ., join.

JOHNSTONE, J., dissents by separate opinion, in which COOPER and GRAVES, JJ., join.

COOPER, Justice, dissenting.

I fully concur with Justice Johnstone's well-reasoned defense of the rule-of-law against the majority opinion's adherence to the rule-of-result. I write separately to lament the demise of Civil Rule 56.

The issue in this case is whether Maresca misrepresented to Karen Roethke whether the PALIC policy which was issued to her and her husband would provide coverage for her husband's after-the-fact work-related injury. Such coverage would have been provided had the policy included the optional "occupational coverage." Unfortunately, the Roethkes neither applied for nor paid a premium for that coverage. They blame Maresca for that omission and seek to hold the insurer vicariously liable. However, Karen Roethke admitted in her pre-trial deposition that when Maresca attempted to explain to her that she could purchase the occupational coverage for an additional premium of $15.00, she interrupted him and told him that she did not want the coverage. As we used to say, she thereby "testified herself (and her husband) out of

court." While acknowledging Roethke's fatal admission, slip op. at 3, the majority opinion nevertheless concludes: "Whether Maresca was prevented by Karen from fully explaining the coverage of the group policy is a factual issue for the jury to resolve in determining if he misrepresented the coverage to her." Slip op. at 9–10. In other words, it makes no difference that Karen admitted under oath that she prevented Maresca from doing precisely what she claims he failed to do, because she will have the opportunity to recant that admission at trial; or, perhaps, the jury will be so sympathetic with her husband's plight that they will give him the money anyway.

Civil Rule 56.03 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, stipulations, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Thus, if the plaintiff admits that the fact essential to his case did not occur, *e.g.*, that Maresca could not have affirmatively misrepresented to Karen Roethke that her policy contained occupational coverage because Roethke prevented him from explaining that coverage to her, then there is no genuine issue of material fact and the movants are entitled to judgment as a matter of law.

However, in *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.,* Ky., 807 S.W.2d 476 (1991), this Court held that summary judgment is only proper "where the movant shows that the adverse party could not prevail *under any circumstances.*" *Id.* at 480 (emphasis added). Since even a party who has otherwise admitted himself out of court during pre-trial discovery might recant that admission at trial, most trial judges assumed after *Steelvest* that summary judgment was reserved to interpreting contracts and such, and that the absence of a genuine issue of material fact was insufficient to support a summary judgment. Simply

put, any case which could not be settled was required to be tried.

But in *Hubble v. Johnson,* Ky., 841 S.W.2d 169 (1992), the defendant was granted summary judgment solely on the basis of his own affidavit setting forth his version of the material facts. Because the plaintiff did not file a counter-affidavit, summary judgment was granted. On appeal, this Court held that "a party opposing a properly supported summary judgment motion cannot defeat that motion without presenting at least some affirmative evidence demonstrating that there is a genuine issue of material fact requiring trial." *Id.* at 171. In other words, the *respondent* did not meet his burden to show that there was a genuine issue of material fact. Nothing was said of the *movant*'s burden to show that the respondent could not prevail at trial under any circumstances.

Most trial judges assumed that *Hubble* represented a retreat from *Steelvest* and a return to the literal language of CR 56.03. Not so. Today's decision reaffirms that summary judgment is dead in Kentucky, at least with respect to determining whether there exists a genuine issue of material fact. Civil Rule 56 was a useful tool for sweeping meritless lawsuits out of our overburdened trial courts, especially where, as here, the plaintiff has admitted the essential fact which renders his case devoid of merit. I lament its passing.

GRAVES and JOHNSTONE, JJ., join this dissenting opinion.

JOHNSTONE, Justice, dissenting.

I agree with the majority that Maresca was an agent of PALIC and NIS notwithstanding the attempt to disavow Maresca's agency status in the agreement between Maresca and NIS. However, while KRS 304.9–020 makes Maresca an agent for PALIC and NIS, it does not establish the scope of Maresca's authority as the companies' agent. "[A] statute making an insurance solicitor the agent of the insurer does

not define the extent of the agent's powers or the scope of his authority." 16 Appleman, *Insurance Law and Practice* § 8697. While the majority pays lip service to this point, it ignores a long and heretofore uninterrupted line of cases that make a clear distinction between general agents and soliciting agents.

As explained in *Prudential Insurance Company of America v. Jenkins,* Ky., 290 Ky. 802, 162 S.W.2d 791, 795 (1942):

> A general agent of an insurance company is generally one who is authorized to accept risks, agree upon and settle the terms of the insurance contracts, issue policies by filling out blank instruments which are furnished him for that purpose, and to renew policies already issued, as distinguished from a soliciting agent who merely procures applications, forwards them to some other officer by whom the policies are issued, collects the premiums and delivers the policies. An agent may be a general agent as to his powers, although he represents the company only in a particular locality or within a limited territory, and in the latter aspect is called a local agent.

*Id.* at 795.

Because Kentucky makes this distinction between general and soliciting agents, the majority's reliance on *Celtic Life Insurance Company v. Coats,* 885 S.W.2d 96 (Tex.1994), is misplaced. At the beginning of its discussion of the case, the *Celtic* court stated, "In the context of life, health, and accident insurance, the Texas Insurance Code makes no distinction between recording agents and soliciting agents.... Rather, agents are defined generally." *Celtic,* 885 S.W.2d at 98. From there, the *Celtic* court, like the majority, relied on common-law rules of agency to determine that the insurer was liable for the misrepresentations of its agent. *Id.* at 99.

In relying on *Celtic,* the majority errs in concluding that the scope of Maresca's authority is fixed upon the determination of his agency status under the statute, which is consistent with the law of Texas. Rather, under the law of Kentucky, we must look to Maresca's agreement with PALIC and NIS to determine the scope of his actual authority. *See Continental Casualty Company v. Neikirk,* Ky., 312 Ky. 577, 229 S.W.2d 58, 60 (1950). The pertinent part of this agreement states:

> If this application is approved and I receive a license to represent any insurance company on whose behalf ... (NIS) markets or administers business ... I understand that I will act as an independent contractor, not an employee or agent of NIS or any insurance company NIS represents.... I understand I will be vested of all commissions, according to the then prevailing scale of commission then in effect as long as I continue to service business in a manner satisfactory to NIS and I continue to be the designated broker of record and hold a valid insurance license.... As acknowledgment of my responsibility to each person to be insured through any coverage marketed or administered by NIS, I agree to fully explain to such persons all benefits, limitations and exclusions that pertain to any coverage I solicit. This explanation will occur prior to or concurrently with the solicitation and completion of any required individual enrollment material.

Thus, the agreement makes Maresca a soliciting agent rather than a general agent.

The rule in this Commonwealth has long been that "where limitations on the soliciting agent's authority are contained in the application, the insured is bound to take notice thereof and he cannot hold the company bound for acts of the agent beyond such limitations ...." *Metropolitan Life Insurance Company v. Tannenbaum,* Ky., 240 S.W.2d 566, 570 (1951).

The application signed by Karen contained the following paragraph:

I, on behalf of the Applicant–Sponsor, its Eligible Employees, and their dependents, understand the Licensed Broker who solicited this Application and Subscription Agreement, or the person on whom we relied to explain any insurance coverages, limitations or exclusions represented by insurance we are seeking under this Agreement was acting as an Independent Contractor and not as a Broker of PALIC or NIS. Furthermore, the person who solicited this Agreement or upon whose explanation of coverages and benefits we relied is in fact our Broker for purposes of this Agreement. We understand as an Independent Contractor and as our Broker that person has no right to bind this coverage, or alter terms or conditions of any Policies or any Enrollment Card or to waive any requirements of PALIC or NIS, or to adjust any claims for benefits under this insurance for which we are applying.

As already noted, KRS 304.9–020 made Maresca an agent of both PALIC and NIS. Thus, that part of the application stating that Maresca is D & B's agent has no effect. This includes that part of the application that purports to make Maresca D & B's agent for purposes of explaining the coverage and benefits of the agreement. However, that part of the application stating that Maresca had "no right to bind this coverage, or alter terms or conditions of any Policies or Enrollment Card or to waive any requirements of PALIC or NIS, or to adjust any claims for benefits under this insurance for which we are applying," is consistent with his status as a soliciting agent, and, thus, was effective notice to Karen of the limitations on Maresca's authority.

The question then becomes whether Maresca's alleged torts were committed while he was acting in the scope of his authority as a *soliciting agent* for PALIC and NIS. Clearly, they were not.

The majority is careful to note that "[t]his is a case in which affirmative misrepresentations about coverage are alleged, not simply the failure to advise a potential insured about optional coverages." The majority must make this distinction because as a general rule under Kentucky law an insurer and its agents owe no duty to advise an insured. *Trotter v. State Farm Mutual Automobile Insurance Company*, 297 S.C. 465, 377 S.E.2d 343, 347 (App.1988); *see also Mullins v. Commonwealth Life Insurance Company*, Ky., 839 S.W.2d 245 (1992), which cited *Trotter* extensively with approval. However, the majority's careful distinction is without a difference.

The alleged affirmative misrepresentation in this case was Maresca's claim that the PALIC policy offered better coverage than D & B's then-existing health insurance plan at a cheaper price. Assuming that this assertion somehow goes beyond mere puffing, it still does not fall within the scope of Maresca's authority as a soliciting agent for PALIC and NIS. Generally, the scope of the authority of a soliciting agent is limited to procuring policies, forwarding them to another officer who is responsible for approving and/or issuing the policy, collecting premiums, and delivering policies. *Jenkins*, 162 S.W.2d at 795. However, in this case, the agreement between Maresca and PALIC and NIS also expressly authorized Maresca to explain the benefits, limitations, and exclusions contained in the insurance policies he solicited. Thus, these duties also fell within the scope of Maresca's authority.

Unfortunately, Maresca's very general qualitative assertions that the PALIC policy was better than D & B's then-existing health insurance plan did not fall within the scope of Maresca's authority to explain the benefits, limitations, and exclusions of the particular PALIC policy in question. Rather, for an affirmative misrepresentation to be a breach of Maresca's duty to explain, the misrepresentation would have to be in the nature of a quantitative mis-

representation of the coverage provided by the PALIC policy.

For example, in *Celtic, supra,* the insurance agent represented to the potential insured that the coverage benefits for psychiatric care contained in the policy he was soliciting was equal to or better than the $20,000 coverage provided by the potential insured's current policy. *Celtic,* 885 S.W.2d at 97. The policy in question stated that psychiatric benefits under the policy were limited to $10,000. *Id.* When questioned about the limitation, the agent represented to the potential insured that the limitation only applied to out-patient psychiatric care. *Id.* The agent's affirmative representation as to the amount of coverage for psychiatric benefits contained in the policy in question was false. His affirmative representation made in response to a direct question concerning the effect of the stated $10,000 limitation for psychiatric benefits contained in the policy in question, was also false.

The agent in *Celtic* made false and quantifiable misrepresentations as to the coverage provided by the policy in question. His comparative claim that the coverage afforded by the policy he was soliciting was better than or equal to the potential insured's current policy merely served as a springboard for his affirmative misrepresentation as to the amount of coverage provided. The comparison made by the agent in *Celtic* went far beyond a mere assertion that one policy was better than the other; rather, the agent's comparison included an affirmative and quantifiable misrepresentation as to the amount of coverage provided for psychiatric care by the policy the agent was soliciting.

In the case at bar, Maresca's claim that the PALIC policy offered better coverage at a cheaper price than D & B's then-existing health plan cannot be construed as an affirmative and specific misrepresentation that the coverage provided by the PALIC policy for work-related injuries was better than the coverage for work-related injuries provided by D & B's then-existing health plan. Maresca never claimed that the PALIC policy provided coverage for work-related injuries. Karen never asked Maresca whether the PALIC policy provided coverage for work-related injuries. Further, she never inquired as to the meaning or the purpose of the optional Occupational Coverage rider in question. Maresca's alleged failure to explain the Occupational Coverage rider to Karen is an act of omission that is not, and cannot be, an affirmative misrepresentation made by Maresca that falls within the scope of his authority as a soliciting agent for PALIC and NIS.

The majority opinion turns on the fact that "[t]his is a case in which affirmative misrepresentations about coverage are alleged ...." Thus, whether Maresca ever explained the significance of the Occupational Coverage rider, or even mentioned the rider to Karen, is immaterial to whether PALIC and NIS can be held vicariously liable for Maresca's acts. Moreover, it is undisputed that when Maresca attempted to explain to Karen that she could purchase the Occupational Coverage rider for an additional $15.00 per month, she interrupted Maresca and told him that she did not want it. However, the majority opinion conveniently ignores that fact in its zeal to reach the desired conclusion that Maresca affirmatively misrepresented the coverage of the policy. There is simply no evidence in the record to support the conclusion that Maresca affirmatively misrepresented the coverage for work-related injuries provided by the PALIC policy.

Stephan and Karen Roethke's plight is compelling. While they have my sympathy, I cannot in good conscience go along with the majority and ignore the law in order to provide them with a potential remedy.

COOPER and GRAVES, JJ., join this dissenting opinion.