**NOT RECOMMENDED FOR PUBLICATION**
**File Name: 19a0065n.06**
**No. 18-5440**

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**

Feb 08, 2019
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| SOUTH FIFTH TOWERS, LLC, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| ASPEN INSURANCE UK, LTD. and TENCO | ) | COURT FOR THE WESTERN |
| SERVICES, INC., | ) | DISTRICT OF KENTUCKY |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |

BEFORE: BOGGS, KETHLEDGE, and STRANCH, Circuit Judges.

BOGGS, Circuit Judge. South Fifth Towers, LLC owns an apartment building in Louisville, Kentucky. After the building suffered water damage in a rainstorm, South Fifth's insurance carrier, Aspen Insurance UK, Ltd., declined to cover demolition and repair costs. South Fifth sued Aspen and Tenco Services, Inc., Aspen's adjuster, for breach of contract (among other claims). The district court granted Aspen and Tenco's motion for summary judgment. Because South Fifth waited twelve days to tell Aspen about the water damage—and during this time, started and nearly finished demolishing the damaged areas of the building, causing substantial prejudice from the delay—we affirm. We also affirm the district court's order that the attorney-client and work-product privileges shield documents that South Fifth sought in discovery.

I

South Fifth owns Kentucky Towers, a high-rise apartment building in downtown Louisville. Aspen provided South Fifth with commercial-property insurance.

Thunderstorms caused 2.69 inches of rain in Louisville on June 26, 2013. A tenant on the ground floor of Kentucky Towers noticed water streaming down the walls of her shop. Kevin Landrum, the building's maintenance supervisor, came to investigate. He discovered that water was entering the building through the ceiling of a closet on the second floor; a pipe above the closet had separated from a roof drain. There was about an inch of standing water in the second-floor hallways.

That same evening, Landrum told South Fifth what had happened. South Fifth contacted its New York insurance broker either that evening or the next day. The broker, Judah Perlstein, did not notify Aspen. Instead, Perlstein's first move was to hire a public adjuster to inspect the damage and write a report. It was his practice to "put a PA on almost every loss." R. 109–7 at 2134. He did this for several reasons: "to get our facts straight" and avoid reporting "erroneous information" to the insurer and "to protect" his "client," as "insurance companies are always looking for a reason not to pay." *Ibid.* Finding a public adjuster in Louisville took Perlstein until June 28.

Next, on July 2 or July 3, South Fifth hired a restoration contractor, The Drying Team. The Drying Team sent 18 people to Louisville. They arrived from Nashville on July 8 and began demolition the same day. They tore out "virtually all" of the second floor. R. 109–9 at 2175.

Perlstein finally told Aspen what had happened on July 8—twelve days after the storm and the same day that The Drying Team began demolition. Aspen then sent its own adjusters (employed by co-defendant Tenco), and they arrived on July 10. By this time, almost all of the demolition was already done.

South Fifth eventually claimed a loss of $1,312,091.04. By January 2015, Aspen had yet to either decline coverage or pay up. South Fifth then sued Aspen and Tenco, alleging breach of contract by Aspen, violations of Kentucky insurance statutes by Aspen and Tenco, and various other claims. In September 2015, Aspen formally declined coverage. After a discovery dispute, the district court denied in part South Fifth's motion to compel production of certain documents. The district court then granted Aspen and Tenco's motion for summary judgment, holding that South Fifth's failure to provide timely notice of the loss and the policy's rain limitation precluded coverage. South Fifth timely appeals the discovery order and the order granting summary judgment for Aspen and Tenco.

II

We begin with the discovery dispute. Aspen and Tenco withheld 27 documents prepared by various adjusters and investigators, and South Fifth moved to compel production. A magistrate judge reviewed the documents *in camera* and denied South Fifth's motion in part, holding that the attorney-client and work-product privileges applied to all but one of the requested documents.[1] The district court affirmed the magistrate judge's order. On appeal, South Fifth's primary argument is that the withheld documents are not privileged because they were prepared for a business purpose: handling the insurance claim. South Fifth offers minimal evidence for this contention, and its other arguments are unconvincing, so we affirm the district court's discovery order.

---

[1] The outlier was a September 25, 2013 report by a Tenco adjuster, which the magistrate judge held was prepared for business reasons.

A

The district court held that the attorney-client privilege protects most of the requested documents.[2] Reviewing the issue de novo, *see Reed v. Baxter*, 134 F.3d 351, 355 (6th Cir. 1998), we agree.

Kentucky law governs.[3] *See* Fed. R. Evid. 501 ("[I]n a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision."). Kentucky's attorney-client privilege protects:

1. "[A] confidential communication"
2. between, as relevant here,
    a. "the client or a representative of the client and the client's lawyer or a representative of the lawyer," or
    b. "representatives of the client or between the client and a representative of the client"
3. "for the purpose of facilitating the rendition of professional legal services to the client."

Ky. R. Evid. 503(b)(1), (4). The privilege does not protect communications "made for business reasons, not legal reasons." *Lexington Pub. Library v. Clark*, 90 S.W.3d 53, 60 (Ky. 2002).

The magistrate judge analyzed each document and gave particularized reasons for applying the privilege, and the district court endorsed the magistrate judge's conclusions in its own thorough opinion. Instead of challenging the document-specific analysis, South Fifth argues that when the reports and emails were written, Aspen's counsel was acting as a claims handler, not an attorney. But South Fifth offers very little evidence of this. It merely points out that the documents were

---

[2] These are: ten "periodic reports" to Aspen from its claims administrator; two reports from Tenco to Aspen's claims administrator and counsel; two emails from Aspen's agent Robert Klipera to Aspen's claims administrator, which forwarded them to Aspen's counsel; a chain of emails between Aspen's counsel, fraud investigators Aspen hired, and Aspen's claims administrator; an email from Tenco to Aspen's claims administrator; and a chain of emails between Aspen's counsel, its claims administrator, and Aspen's agent Doug Pinelli.

[3] We explain why in Section III-B below.

prepared in 2013 and 2014, before litigation and before Aspen formally denied the claim. But this timeline does not suggest that the documents had no legal purpose. As the district court observed, "[e]ach time the Magistrate Judge found a document to be privileged, he cited or described language in the document indicating that it contained confidential communications with Aspen's attorney *regarding the impending litigation*." R. 97 at 1862 (emphasis added). South Fifth gives us no reason to doubt this. We see no error in the district court's analysis of the attorney-client privilege.

B

The district court held that the work-product privilege protects all but one of the remaining documents.[4] South Fifth's arguments on this front fare no better.

"The work-product doctrine is a procedural rule of federal law; thus, Federal Rule of Civil Procedure 26 governs this diversity case." *In re Professionals Direct Ins. Co.*, 578 F.3d 432, 438 (6th Cir. 2009). The work-product privilege protects documents "prepared in anticipation of litigation . . . by or for another party or its representative." Fed. R. Civ. P. 26(b)(3)(A). Our test "asks (1) whether a document was created because of a party's subjective anticipation of litigation, as contrasted with an ordinary business purpose, and (2) whether that subjective anticipation of litigation was objectively reasonable." *United States v. Roxworthy*, 457 F.3d 590, 594 (6th Cir. 2006). "We review a district court's work product privilege determination for abuse of discretion." *Id.* at 592.

---

[4] These are: a report to Tenco from HAAG Construction, which inspected the damage; five reports to Aspen from its claims administrator; a report to Aspen from its fraud investigator; and two emails from Aspen's agent Robert Klipera to Aspen's claims administrator, which forwarded them to Aspen's counsel. As with the attorney-client-privileged documents, the magistrate judge reviewed the reports and emails *in camera* and gave particularized reasons for applying the work-product privilege, which the district court accepted.

South Fifth has three arguments against applying the work-product privilege, none of which persuade us that the district court abused its discretion. First, it makes the same claim it made regarding attorney-client privilege: that the documents were prepared for business reasons. Again, though, this is not much more than a conclusory assertion. South Fifth cites a district-court opinion holding that certain insurance-investigation documents were prepared for business purposes despite the involvement of counsel. *St. Paul Reinsurance Co., Ltd. v. Commercial Fin. Corp.*, 197 F.R.D. 620, 638 (N.D. Iowa 2000). But the Northern District of Iowa made its (fact-intensive) privilege determination de novo; its holding does not tell us whether the district court abused its discretion in this case. South Fifth is making a "deference mistake." *See* Jonathan S. Masur and Lisa Larrimore Ouellette, *Deference Mistakes*, 82 U. Chi. L. Rev. 643, 645 (2015).

Next, South Fifth contends, there is insufficient evidence that Aspen reasonably anticipated litigation when it (or its representatives) prepared the documents. South Fifth argues that the magistrate judge and district court overrelied on a November 6, 2013 letter from South Fifth's counsel to Aspen's counsel. The letter warned that "failure to attend to South Fifth's insurance claim would 'lead to the conclusion that Aspen is in breach of its policy.'" R. 97 at 1858. As the district court observed, "[g]iven that 'breach of contract' is a common cause of action in insurance disputes, it was reasonable for the Magistrate Judge to find that a letter warning the opposing party that it would be 'in breach of its policy' . . . created both a subjective[ ] and objectively reasonable anticipation of litigation." *Id.* at 1859. South Fifth has no response to this common-sense conclusion.

Finally, South Fifth claims that even if the work-product privilege applies, it is entitled to the documents under the substantial-need exception. Documents "may be discovered" notwithstanding the work-product privilege if the party requesting them "shows that it has

substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A)(ii). South Fifth must show that it has no other way of obtaining the "information" the reports contain, not just that it has no other way of obtaining the reports themselves. *Stampley v. State Farm Fire & Cas. Co.*, 23 F. App'x 467, 471 (6th Cir. 2001). It does not make this showing. South Fifth had exclusive access to the building for almost two weeks, and after Aspen and Tenco arrived, it had equal access. There was ample opportunity for South Fifth's own experts to inspect the damage and draw their own conclusions. The district court did not abuse its discretion.

## III

We now turn to the summary-judgment order. The insurance policy required South Fifth to give Aspen "prompt notice of the loss or damage," including, "[a]s soon as possible, . . . a description of how, when and where the loss or damage occurred." R. 109–1 at 2009. Yet South Fifth waited twelve days to tell Aspen about the water damage to its building—and during this time, started and nearly finished demolition of the damaged areas. There can be no genuine dispute that Aspen likely suffered substantial prejudice from this delay. We therefore affirm the district court's grant of summary judgment to Aspen and Tenco.[5]

## A

"We review the district court's grant of summary judgment de novo." *Donald v. Sybra, Inc.*, 667 F.3d 757, 760 (6th Cir. 2012). Aspen and Tenco are entitled to summary judgment if they can "show[ ] that there is no genuine dispute as to any material fact" and they are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

---

[5] The district court held that summary judgment for Aspen on the breach-of-contract claim compelled summary judgment for Aspen and Tenco on all the remaining claims. South Fifth does not challenge this holding on appeal.

(1986). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for" either party. *Ibid.* "The inferences to be drawn from the underlying facts must be viewed in the light most favorable to" South Fifth, as the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (cleaned up).

B

We interpret the insurance contract between South Fifth and Aspen according to state law. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). The policy does not have a choice-of-law clause, and the parties dispute whether New York or Kentucky law governs. We hold that Kentucky law controls.[6]

Kentucky is the forum state, so we apply its choice-of-law rules. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Kentucky uses § 188 of the Restatement (Second) of Conflict of Laws "to resolve choice of law issues that arise in contract disputes." *State Farm Mut. Auto. Ins. Co. v. Hodgkiss-Warrick*, 413 S.W.3d 875, 878 (Ky. 2013). Under this approach, the law of the state with "the most significant relationship to the transaction and the parties" controls. Restatement (Second) of Conflict of Laws § 188(1) (1971). Kentucky also tends to "look to . . . other Restatement provisions" to resolve choice-of-law questions. *Wallace Hardware Co. v. Abrams*, 223 F.3d 382, 398 (6th Cir. 2000).

Two factors weigh in favor of applying Kentucky law. First, in most insurance cases, the Restatement gives "[t]he location of the insured risk . . . greater weight than any other single contact," particularly "when the insurance covers an immovable object, such as a house." Restatement § 193 cmt. b; *see also Hodgkiss-Warrick*, 413 S.W.3d at 879 ("With respect to

---

[6] "We review de novo the district court's choice-of-law determination." *Newberry v. Silverman*, 789 F.3d 636, 640 (6th Cir. 2015). Here, though, the district court did not make a choice-of-law determination. It noted arguments on each side and then concluded that Aspen was entitled to summary judgment under both Kentucky and New York law.

casualty insurance contracts in particular, a key factor is the expectation of the parties concerning the principal location of the insured risk."). Second, "Kentucky courts have apparently applied Kentucky substantive law *whenever possible*." *Harris Corp. v. Comair, Inc.*, 712 F.2d 1069, 1071 (6th Cir. 1983); *see also Wallace Hardware Co.*, 223 F.3d at 391 (approvingly quoting the district court's "observation that 'Kentucky courts are egocentric concerning choice of law questions'" and explaining that "we likewise have noted this provincial tendency in Kentucky choice-of-law rules").

Admittedly, the insurance policy was issued in New York, South Fifth obtained it through a New York broker, and South Fifth is a New York citizen. However, the building's location and Kentucky's strong choice-of-law bias outweigh these New York connections. Thus, we will use Kentucky law to interpret the policy.

## C

South Fifth first argues that it provided "prompt" notice, as required by the insurance policy, because it contacted Aspen within twelve days. The policy does not define "prompt," so we give that term its ordinary meaning. *See James Graham Brown Found., Inc. v. St. Paul Fire & Marine Ins. Co.*, 814 S.W.2d 273, 279 (Ky. 1991). "Prompt" means "performed readily or immediately," or "given without delay." *Webster's Third New International Dictionary* 1816 (2002). Moreover, the insurance policy construed as a whole supports this definition, since the policy also required South Fifth to give Aspen a description of the loss or damage "as soon as possible." R. 109–1 at 2009. South Fifth could not give Aspen a description of the loss or damage until South Fifth had notified Aspen about the loss or damage in the first place. Thus, the policy required South Fifth to provide notice as soon as it could.

Here, South Fifth did not provide notice as soon as it could have—it notified Aspen eleven days after it notified its insurance broker, Perlstein. Indeed, when Perlstein was asked about this delay, he could not explain why Aspen had not been notified sooner. And on appeal, South Fifth fails to explain the delay. To be sure, whether the insured party gave timely notice is typically a question of fact left for the jury. *See Falls City Plumbing Supply Co. v. Potomac Ins. Co.*, 237 S.W. 376, 378 (Ky. 1922). Yet, given the undisputed facts of this case, "the lapse of time [was] so long as to be obviously [noncompliant] with the [policy]." *Ibid*. Hence South Fifth failed to give "prompt" notice.

## D

Late notice of a loss lifts the insurer's coverage obligations as long as "it is reasonably probable that the insurance carrier suffered substantial prejudice from the delay in notice." *Jones v. Bituminous Cas. Corp.*, 821 S.W.2d 798, 803 (Ky. 1991). There is no genuine dispute that South Fifth's twelve-day delay in notice created a reasonable probability of substantial prejudice to Aspen.

The late notice deprived Aspen of the chance to see the water damage before demolition began. This meant that Aspen had no way of assessing how much of the demolition was necessary or of objecting to needless or too-costly demolition before it happened. Had Aspen's adjusters been present when the demolition contractor first arrived at Kentucky Towers, they could have watched and interjected as the contractor took moisture readings and mapped out which portions of the second floor to tear out. According to Richard Michelson, South Fifth's public adjuster, "[i]t's certainly helpful if the [insurance company's] adjuster is there" for this process. R. 109–8 at 2160. Admittedly, Aspen's adjusters and engineers were able to take their own moisture readings once they arrived, and they could review the demolition contractor's invoices. They could

also inspect waterlogged rubble in dumpsters. But no matter how much they learned from these steps, the demolition was already done, and Aspen had no chance to inspect the damage, view pre-demolition moisture readings (which the contractor did not retain), or ask the contractor to do anything different in such extensive—and expensive—demolition.

Even if all of the demolition was appropriate, the late notice made it impossible for Aspen to consult and coordinate with the demolition contractor and South Fifth. Michelson, the public adjuster, explained that it "would be . . . normal protocol" for him to keep in contact with Aspen's adjusters. R. 109–8 at 2158. "[A]bsolutely you want the insurance adjuster to see the loss," in order "to walk and scope damages and discuss action plans and get on the same page." *Id.* at 2159. With this kind of coordination, "the claim tends to go smoother." *Ibid.* Scott Tarpley, who led the demolition contractor's team, explained that "[w]hen adjusters are available early on," they can discuss which tests, tools, and techniques to use. R. 109–9 at 2175. For this reason, Tarpley was "slightly appalled that [Aspen] did not have qualified people there earlier on." *Id.* at 2177.

Thus, the undisputed facts and the testimony of South Fifth's own public adjuster and demolition contractor show a reasonable probability of substantial prejudice to Aspen. South Fifth offers two arguments to the contrary; neither persuades us.

First, South Fifth argues that its contractual duty "to protect the Covered Property from further damage" required it to commence demolition when it did. R. 109–1 at 2009. As public adjuster Michelson put it, "the concern is that you get microbial growth, mold . . . . The building doesn't get any better while it's sitting there wet, it only gets worse and degrades." R. 113–3 at 2611. This was all the more reason not to wait twelve days before notifying Aspen. South Fifth knew that the damage was significant and would require extensive demolition. According to its

insurance broker, Judah Perlstein, "[t]here was no downside" to notifying Aspen the day of the rainfall. R. 109–7 at 2135. But South Fifth dawdled, presenting Aspen with a fait accompli.

Second, South Fifth points out that one of its expert reports called the notice timely. Howard Wolf, "a certified master restorer and restoration consultant," opined that South Fifth gave notice to Aspen within "usual and customary timeframes." R. 108–1 at 1937, 1944. But Wolf based this opinion on a factual error. He wrote that "the public adjuster filed an official claim within five days of the loss," but it is undisputed that South Fifth took twelve days to notify Aspen. *Id.* at 1944. Also, Wolf's report supports the conclusion that the late notice prejudiced Aspen. Wolf explained that "[t]ypically, owner and carrier representatives actively participate in the execution of the [restoration] project through communication and agreement of work performed in each phase." *Ibid.* South Fifth's late notice prevented this communication and agreement—even though "[t]his project is a clear example of a project high in complexity and exposure to the owner and carrier." *Ibid.*

Thus, the record reveals no genuine dispute that South Fifth's late notice created a reasonable probability of substantial prejudice to Aspen.

E

South Fifth tries to get around this conclusion by claiming that it waited at most one day to notify Aspen, not twelve. The argument is that South Fifth's insurance broker, Judah Perlstein, acted as *Aspen*'s agent for the purpose of receiving notices of loss. South Fifth told Perlstein about the water damage on either the evening of the storm or the next day. But Kentucky law and Perlstein's testimony make clear that he was not Aspen's agent.

The general rule in Kentucky is "that in the absence of statutory authority or some special indicia of authority," an insurance broker "is the agent of the insured and not of the insurer." *J.*

*Inmon Ins. Agency, Inc. v. Kentucky Farm Bureau Mut. Ins. Co.*, 549 S.W.2d 516, 518 (Ky. Ct. App. 1977). Consequently, "notice to this broker is not notice to the insurer." *Ibid.*

South Fifth does not point to any "statutory authority or special indicia of authority" justifying an exception to the default rule and showing Perlstein to be Aspen's agent. *Ibid.* Instead, it cites *Pan-Am. Life Ins. Co. v. Roethke*, 30 S.W.3d 128 (Ky. 2000). The case is inapposite. The *Roethke* court relied on a (now defunct) statutory provision defining "agent" as

> an individual, firm, . . . [or] corporation . . . appointed by an insurer to solicit applications for insurance or annuity contracts or to negotiate insurance or annuity contracts on its behalf, and if authorized to do so by the insurer, to effectuate and countersign insurance contracts.

*Id.* at 131 (quoting then–Ky. Rev. Stat. § 304.9–020). Perlstein does not meet this definition of "agent": No evidence in the record suggests that Aspen "appointed" Perlstein to "solicit," "negotiate," or "effectuate" insurance contracts.

*Roethke* aside, Perlstein's testimony confirms that he was not Aspen's agent. In his deposition, he testified that he got a public adjuster involved because "I knew I have [a] client that I have to protect" from the possibility of Aspen refusing to pay. R. 109–7 at 2132, 2134. He boasted about his use of "grandstanding" and "threat[s]" to get his clients better prices or "better terms and conditions" from insurance carriers. *Id.* at 2131. He admitted that he did not "know why carriers ask or don't ask" for certain information in coverage applications, and he said that despite decades in the industry, carriers "surprise me every day." R. 119–1 at 2649. These statements make clear that Perlstein was not Aspen's agent.

F

To summarize, the insurance policy required South Fifth to promptly notify Aspen—not just Perlstein—of any loss. It breached the policy when it waited twelve days to give Aspen the required notice, and this undisputedly caused Aspen substantial prejudice. This relieved Aspen of

liability under the policy, and Aspen and Tenco are entitled to summary judgment on this basis alone. We need not reach the district court's alternative holding that the policy's rain limitation also precluded coverage.

The judgment of the district court is **AFFIRMED**.