## METROPOLITAN LIFE INS. CO. v. TANNENBAUM.

Court of Appeals of Kentucky.

June 12, 1951.

Bell, Stagner & Orr, Bowling Green, for appellant.

Rodes K. Myers, Bowling Green, for appellee.

STEWART, Justice.

Appellee, Rebecca Tannenbaum, instituted this action in the Warren circuit court to recover of appellee, Metropolitan Life Insurance Company, $2000 upon a policy of insurance issued on August 28, 1944, upon the life of her husband, Sam Tannenbaum, with her as beneficiary. Judgment was rendered in her favor for the face amount of the policy, and the Insurance Company appeals.

The answer of appellant alleged that Sam Tannenbaum procured the execution and delivery of the policy to him because

he signed and filed with the Insurance Company his application dated July 29, 1944, which application in Part B contained the following questions and answers, and that the answer made by the insured in each instance was false and material:

"6. What is your present condition of health?" Ans. "Good".

"7. (a) When last sick?" Ans. "Jan. 1940." "(b) Nature of last sickness?" Ans. "Cold". "(c) How long sick?" "3 days."

"16. (a) Have you ever been told that you had any heart trouble?" Ans. "No." "(b) Have you ever been treated for, or told that you had, high blood pressure?" Ans. "No".

"17. Name and address of your usual medical attendant?" Ans. "Dr. Martin, Bellville, Ill."

"18. Have you even had any of the following complaints or diseases? * * * Asthma, Bronchitis * * * Disease of Heart * * * Disease of Lungs * * Habitual Cough * * * Colic * * * Pleurisy * * * Rheumatism * * * If yes, give particulars, dates and duration." Ans. "No".

"23. What clinics, hospitals, physicians, healers or other practitioners, if any, have you consulted or been treated by, within the past five years? If none, so state." Ans. "Beth Moses Hospital, Brooklyn, N. Y."

"Diagnosis: Hernia"

"Treatment: Herniotomy"

"Date and Duration: 13 days 1929"

"Results: excellent"

The following stipulation is also embraced in the application, to-wit:

"I hereby certify that: (1) I have read the answers to the questions in Part A and Part B hereof, before signing, (2) they have been correctly written, as given by me (3) they are full, true and complete, and (4) there are no exceptions to any such answers other than as stated herein."

At the trial the evidence showed that Sam Tannenbaum came to Bowling Green, Kentucky, from Belleville, Illinois, to visit his son, Herman, and, while in Bowling Green, Albert Bass, a soliciting agent of appellant, sold him the policy in suit. The insured could neither read nor write and Bass testified that he inserted the answers to all of the questions in Part A and Part B of the application exactly as the insured gave them to him. Bass also said that he originally intended to sell Tannenbaum a non-medical policy but when he discovered Tannenbaum was over the age limit for this type of insurance he advised him he would have to be insured on the basis of a medical examination.

He then went with Tannenbaum to Dr. Hoy Newman of Bowling Green, an authorized medical examiner of appellant, who approved Tannenbaum for the insurance and who testified at the trial that when he examined Tannenbaum he seemed from all appearance to be in good health. The policy was delivered to the insured by Bass three or four weeks later. The insured died on March 30, 1945. The immediate cause of his death was coronary occlusion due to chronic myocardosis and bronchial asthma.

Appellant's testimony deals chiefly with the health and medical history of Tannenbaum during the two-year period preceding the date of issuance of the policy. The Insurance Company produced evidence in the form of a letter secured by it from and signed by Dr. H. I. Spector, deceased at the time of the trial, of St. Louis, Missouri. Dr. Spector wrote that he first examined insured on December 6, 1943, at which time he complained of difficulty in walking because of shortness of breath, and he stated he was also afflicted with coughing and dizzy spells. A physical check-up of Tannenbaum revealed harsh breath sounds throughout both lungs and a tendency toward the emphysematous (bloated) type of chest. Tannenbaum went back to Dr. Spector on December 12, 1943, on January 7, 1944, on March 14, 1944, and on May 17, 1944, for re-examination which did not reveal any changes in his condition for the better. A flat x-ray was taken of Tannenbaum by Dr. Spector on May 22, 1944, which disclosed evidence of chronic bronchitis, emphysema (enlarge-

ment of the small structures of the lungs), and probable bronchiectasis (dilatation of the larger bronchial tubes); however, at that time, other tests and the blood count of the patient ruled out the possibility of asthma. Tannenbaum visited Dr. Spector on June 5, 1944, and July 5, 1944. The last time he saw the patient was on September 20, 1944, and Tannenbaum's physical condition was still unimproved and his weight was down to 117 pounds.

Contending the policy had been rendered void at the time of the death of the insured, for the reason that Tannenbaum in applying for the insurance had given false answers to the questions in the application that were material to the risk, the Insurance Company offered to return to the beneficiary all of the premiums paid thereon totalling $84.96, acceptance of which was refused.

KRS 296.160 provides: "All statements or descriptions in any application for a policy of insurance shall be deemed and held representations and not warranties. Misrepresentations, in an application, unless they are material or fraudulent; shall not prevent a recovery on the policy."

■ Under the section just quoted this Court has uniformly held that a material misrepresentation in an application for an insurance policy, though innocently made, will avoid it and that, although the misrepresentation may not be material, yet if it is fradulently made by the insured it will, nevertheless, avoid the policy. The Maccabees v. Covert, 302 Ky. 481, 194 S.W.2d 498; Prudential Insurance Company of America v. Lampley, 297 Ky. 495, 180 S.W. 2d 399; Business Men's Assur. Co. of America v. Conley, 280 Ky. 375, 133 S.W. 2d 554; and Ford v. Commonwealth Life Ins. Co., 252 Ky. 565, 67 S.W.2d 950.

Appellee, in her reply, seeks to escape the application of the above principle of law to her case by alleging that the insurer was not deceived or misled by the answers to the questions in the application. Then she attempts to explain the incorrectness of insured's statements by claiming they were true to the best of his knowledge and belief. Next she asserts that, between the date of the application and the date of issuance of the policy, a month intervened, which gave the insurer ample time to investigate the applicant. The application, she says, contained enough information to furnish a basis for any investigation the Insurance Company might decide to make. Furthermore, insured issued the policy voluntarily and never at any time attempted to cancel it.

■ The foregoing contentions amount to nothing more than conclusions based upon pure speculation. The controlling point here is not what the Insurance Company might have done to avoid the practice upon it of deception but whether or not deception was actually practiced upon it. We have had no difficulty in deciding that the evidence in this case is sufficient to show that the answers to the above questions are false.

■ The next question is whether or not the materiality of the answers was properly proven. The rule on this point is that a false answer is material if the insurer, acting reasonably and naturally in accordance with the usual practice of life insurance companies under similar circumstances, would not have accepted the application if the substantial truth had been stated. The Maccabees v. Covert, supra; Chamberlain v. National Life & Acc. Ins. Co., 256 Ky. 548, 76 S.W.2d 628; Sovereign Camp, W. O. W. v. McDaniel, 251 Ky. 212, 64 S.W.2d 581; Commonwealth Life Ins. Co. v. Goodknight's Adm'r, 212 Ky. 763, 280 S.W. 123; and Blenke v. Citizens' Life Ins. Co., 145 Ky. 332, 140 S.W. 561.

Appellant introduced the testimony of Clarke Weidenfeller, life underwriter for the Insurance Company since 1941, whose duty consists of reviewing and approving applications for intermediate and ordinary policies of life insurance, and of Dr. Albert O. Jimenis, an associate medical director with the Insurance Company since 1919, whose exclusive work involves passing medically upon the issuance of life insurance policies. Each witness testified, in substance, that he was familiar with the standards required of applications for insurance with the Metropolitan Life Insurance Company, and that if true answers

had been given by Tannenbaum to the questions asked in the application the policy would not have been issued to him.

■ Appellee argues that even if the answers to the questions in Part A and Part B in the application are in fact false, the medical examination by the Insurance Company's doctor and the filling out by him of Part C changed the policy from a non-medical to a medical one, so that Part A and Part B in the application were automatically cancelled out by Part C and only Part C controlled the policy thereafter. This line of reasoning is specious because the policy agreement itself expressly refutes such an implication. Part C is not a part of the application and never became attached to or incorporated into the policy; but the policy itself on page 1 embraces in the insurance contract the application consisting solely of Part A and Part B by this language:

"This Policy is issued in consideration of the Application therefor, copy of which Application is attached hereto and made part hereof, and of the payment of the premiums as hereinafter provided."

■ Morever, neither the agent nor the medical examiner could change any of the provisions of the policy in any manner or make any assurances that would be binding upon the Insurance Company because of the following agreement contained in the application signed by the insured, to-wit: "No agent, medical examiner or any other person, except the Officers of the Company, have power on behalf of the Company: (a) to make, modify or discharge any contract of insurance or (b) to bind the Company by making any promises respecting any benefits under any policy issued hereunder."

In his brief counsel for appellee admits that the record in this case clearly shows that the agent of appellant failed to include in the application the correct answers to certain questions in the application, notwithstanding the fact that Tannenbaum furnished the truth to the agent in each instance. Therefore, the insured should not be charged with the acts of the agent in making false answers when the agent was given accurate information to each question. The knowledge gained from Tannenbaum by the agent is imputed to the insurer, he argues. Here we quote again from the application the agreed stipulation that controls on this point, namely: "No statement made to or by, and no knowledge on the part of, any agent, medical examiner or any other person as to any facts pertaining to the applicant shall be considered as having been made to or brought to the knowledge of the Company unless stated in either Part A or Part B of this application."

■ It is a well established principle of law in this state that where limitations on the soliciting agent's authority are contained in the application, the insured is bound to take notice thereof and he cannot hold the company bound for acts of the agent beyond such limitations, nor can such an agent bind his principal by an act of waiver which conceals information in the application material to the risk. Commonwealth Life Ins. Co. v. Bruner, 299 Ky. 335, 185 S.W.2d 408; Prudential Ins. Co. of America v. Lampley, supra; Connecticut Fire Ins. Co. v. Roberts, 226 Ky. 534, 11 S.W.2d 148; and Prudential Ins. Co. of America v. Jenkins, 290 Ky. 802, 162 S.W.2d 791.

It is our opinion that the evidence produced in this case firmly establishes the falsity of the representations made by insured in the application. The materiality of the misrepresentations to the risk under the policy is not a disputed fact. Therefore, the circuit court should have directed the jury to find for the appellant.

In view of the decision we have reached, it becomes unnecessary to consider the complaint raised by appellant relative to the instructions mentioned in its brief.

Wherefore, the judgment is reversed for further proceedings consistent herewith.

LATIMER, Justice (dissenting).

I can not agree with the majority opinion herein. Under it the insurance company may say: It is our privilege to select our

agent; it is our privilege to select our doctor. The applicant must apply through our selected agent and be examined by our selected doctor. Multiple and complex questions are asked and though the applicant in answering tells our agents the truth, who then instead of writing in the answers as given falsify the answers, the responsibility therefor is applicant's, not ours.

This is placing no corresponding responsibility upon the one with the privilege of selecting and naming the agent. It, in reality, makes both the soliciting agent and the doctor the agents of applicant.

I think the correct rule is found in 29 Am. Jur., Insurance, Section 846: "Apart from any question of the effect of an attempt by the insurer to limit the authority of its agent by stipulations inserted in the application or policy, or provisions in its by-laws, or by statute, the rule supported by the great weight of authority is that if an application for insurance is drawn by an agent of the insurer, who fills in false answers to the interrogations contained therein which are truthfully answered by the insured, without fraud, collusion, or actual knowledge of the insured, or the existence of circumstances from which constructive knowledge of such falsity might be imputed to him, the insurer cannot rely upon the falsity of such answers in seeking to avoid liability under the policy issued upon the application. The view generally taken is that the agent in making out the application acts for the insurer, and that the insurer is therefore estopped to assert the mistake or, as has been said in some cases, the mistake is deemed to be waived by the insurer."

The instant policy contained a provision to the effect that no statement to, or by, and no knowledge on the part of any agent, medical examiner or any other person "as to facts pertaining to the applicant should be considered as having been made to or brought to the knowledge of the Company unless stated in either part A or part B of this application."

Prior to the Roberts case, cited as controlling in the majority opinion, this jurisdiction refused to give effect to a limitation in such respect upon the authority of an agent or medical examiner. See Standard Auto Insurance Association v. Russell, 199 Ky. 470, 251 S.W. 628.

I am of the opinion that the refusal to give effect to the limitation should apply especially in cases where the insurer itself does not rely solely upon the answers in the application but goes further and requires a medical examination. In which event the knowledge of the examining physician should be imputed to the principal. See 45 C.J.S., Insurance, § 692, P. 649. Whether or not truthful or false answers were made to the agents should be a question for the jury.

For these reasons I respectfully dissent. Chief Justice CAMMACK and Judge COMBS join me in this dissent.

MOREMEN, Justice (concurring).

I am compelled to concur with the majority opinion, not for the reason that I am willing to accept the legal philosophy therein affirmed, but only because the opinion, under the facts presented, clearly and succinctly applies the rules of conduct which were in force at the time the application was signed and the medical examination was had.

All legal standards or rules should be subject to definition, and, after having been defined according to the practical wisdom of the era, should acquire some stability. In modern life it is sometimes more important to know the rules, than to recognize the reasons behind them. The penalty for the breach of the rule is always crystal clear and rigid, so, therefore, the rule itself should be lucid and sharp.

I do not imply that a rule of law should not be changed, when the reason for the rule has become extinct, or when the rule is the result of unsound reasoning. A change in policy (under our system of jurisprudence) should be made only after notice of some character, and not abruptly after the rights of the parties have vested under the existing law.

By the holding in the Roberts case, we overruled the preexisting law. The minority of the court believe that we should return to

the original thought expressed in earlier cases, which I believe was correct in principle. However, at this time, I feel that the demands of the doctrine of stare decisis outweigh any tendency which I have to join them.