**PENNSYLVANIA LIFE INSURANCE COMPANY, Appellant,**

v.

**Willie McREYNOLDS, Appellee.**

Court of Appeals of Kentucky.

March 28, 1969.

John David Cole, Harlin, Parker, Ricketts, Lucas & English, Bowling Green, for appellant.

Titus Lyle, Keen & Lyle, Scottsville, for appellee.

MILLIKEN, Judge.

This is an appeal from a summary judgment for the claimant, the insured, under two nonmedical accident and health policies issued to him by the appellant, Pennsylvania Life Insurance Company, upon the signed representation of the insured, in his application for the insurance, that he had never had heart disease, high blood pressure or diabetes. The policies were issued by the Company on January 26, 1966, and the insured suffered a severe stroke a month later, on February 27, which apparently resulted in total disability.

The Company refused to pay the benefits under the policies, tendered its check for premiums paid, and in its answer and counter-claim prayed that the policies be cancelled or rescinded. The pleadings, the deposition of the claimant taken on discovery, and the deposition of the physician who had treated the claimant for several years, were the basis for motion for summary judgment and for judgment on the pleadings by both the claimant and the Company, and the trial court granted summary judgment for the claimant.

The insured, Willie McReynolds, said in his deposition taken on discovery, that the Insurance Company's soliciting agent, Burchell, and several other men who represented the Company, had rented accommodations at McReynolds' motor court, and that Burchell called McReynolds to his car at the Scottsville livestock yard where McReynolds had taken a calf to sell. McReynolds said that he sat in the car with Burchell who immediately sought to sell him insurance and asked him certain questions about his health. When asked whether he had high blood pressure, McReynolds testified he said, "Not to amount to anything * * *. He asked if it run very high or up to 200, or something like that, and I said, no, it don't." When McReynolds told Burchell that he had diabetes "in a mild form", Burchell asked, "What do you mean by a mild form?" and McReynolds answered, "I control it by taking tablets and watching my diet." McReynolds said Burchell then asked, "Have you ever had insulin?" When McReynolds answered, "No, I never had a shot of insulin in my life," he said Burchell commented, "Well, we'll put 'no'", and McReynolds continued, saying, "and that's what was done and I did not have to take many of them tablets, but he knew that; he'd had it explained to him." When queried as to why he signed the application with the answers "no" as to whether he had diabetes and high blood pressure, when the answer to the questions should have been "yes", McReynolds said, "I told him (Burchell) the truth, and he done that. That's his business."

Apparently, Burchell was a young man as compared to fifty-seven-year-old McReynolds, and was competing in a Company sales contest at the time he sold the policies to McReynolds. One may view the conduct of Burchell and McReynolds in several different ways—as collusive, as fraudulent on the part of either or both, or

as just an instance of an eager-beaver selling health and disability insurance to a man who thought he needed it. We are inclined to the more tolerant view of the transaction because of the tenor of the McReynolds testimony, the fact that on his signed applications for the insurance he authorized the insurer to procure his medical record from his physician, and the subsequent conduct of Burchell as related by McReynolds after the stroke had disabled him.

Had the insurance carrier interviewed McReynolds' physician as permitted by the applicant, it would have found that Dr. Holcomb, who had been McReynolds' physician since 1948, would reveal that he first found McReynolds had a mild-to-moderate diabetes in 1958 and prescribed orinase for it and never gave him a shot of insulin until after his stroke in 1966; that McReynolds had blood pressure of 180/90 in 1952 when normal pressure for a man of his age was 150/90, and that he prescribed no treatment for the blood pressure except cautioning him to watch his diet and get more rest; that in April of 1965, McReynolds' blood pressure was 170/90 and in December 1965, a few weeks before the application for insurance, it was a normal 150/90. This is the essence of Dr. Holcomb's deposition introduced by McReynolds in support of his case, but Dr. Holcomb deposed also that he did not believe that McReynolds' blood pressure or diabetes had any direct connection with the thrombosis which felled him—that that could happen to anyone. McReynolds said Burchell came to see him a day or two after his stroke and said he checked to see if the insurance was in effect and said, "You are lucky, and you haven't got anything to worry about as far as our insurance is concerned * * *. Everything will be taken care of."

The legislative policy of this State is declared in KRS 304.656 which provides:

"All statements or descriptions in any application for an insurance policy or in negotiations therefor, by or in behalf of the insured, shall be deemed to be representations and not warranties. Misrepresentations, unless material or fraudulent, shall not prevent a recovery on the policy."

On the basis of the testimony in this record, it is apparent that McReynolds made no misrepresentation when he answered Burchell's questions, that any misrepresentation which eventuated, originated in the judgment of the soliciting agent, Burchell, and not with the applicant, McReynolds, whose signatures to the applications followed the implied assurance that the low degrees of McReynolds' diabetes and high blood pressure made them inconsequential.

In the application forms filed in this record there is no notice to the applicant that the soliciting agent's authority was limited in any way, so we are not bound by that aspect of our reasoning enunciated in cases where the application form contained notice of the limitations on the authority of the Company's soliciting agent. Connecticut Fire Ins. Co. v. Roberts, 226 Ky. 534, 11 S.W.2d 148 (1928); Prudential Ins. Co. of America v. Lampley, 297 Ky. 495, 180 S.W.2d 399 (1944); Commonwealth Life Ins. Co. v. Bruner, 299 Ky. 335, 185 S.W.2d 408 (1945); Metropolitan Life Ins. Co. v. Tannenbaum, Ky., 240 S.W.2d 566 (1951); Mills v. Reserve Life Ins. Co., Ky., 334 S.W.2d 955 (1960); We have held, in the instance of the last two cases cited, that even illiterates were bound by the notice on the application of the soliciting agent's lack of authority to waive any of the requirements of the application. In Kentucky Central Life Ins. Co. v. Combs, Ky., 432 S.W.2d 415 (1968), where false answers were written on an application for an illiterate, allegedly by the soliciting agent, we held the answers were a material misrepresentation regardless of who inserted them, and denied recovery. A corollary of the principle that an applicant is bound by actual or constructive notice of the limitations on the authority of the agent was stated in Paxton v. Lincoln Income Life

Insurance Company, Ky., 433 S.W.2d 636 (1968) where we said, "Simply stated, the rule is that as between the applicant and the insurance company it is the applicant's responsibility to see that the application is correctly filled out."

On the familiar theory that the carrier was responsible for the acts of its agents since it selected them, this court held at one time that the carrier was estopped to assert the defense of false answers in an application as a material misrepresentation where an applicant, acting in good faith and without an intent to deceive the carrier, signed the application without knowledge of the insertion of false answers by the agent. Aetna Life Ins. Co. v. McCullagh, 185 Ky. 664, 215 S.W. 821 (1919); Standard Auto Ins. Ass'n v. Russell, 199 Ky. 470, 251 S.W. 628, 35 A.L.R. 1468, (1923).

In 1928, recognizing the distinction between the broad authority of general agents and the limited authority of soliciting agents so far as their power to waive or modify the requirements of the carrier were concerned, we held that the carrier could effectively limit its soliciting agent's authority by clauses of limitation in its application forms and also in fire and tornado insurance policies issued by the carrier, and concluded that the insured was bound by those limitations and that the soliciting agent had no power to waive any such limitations, commenting that acceptance of the policy by the applicant made it the contract between him and the company "* * * and he is charged with knowledge of its terms—among others, the limitations upon the power of the agent of the company. The authority of an agent to effect a waiver in the face of a limitation denying his power to waive warranties or conditions is not vested in every agent who may represent the company." Connecticut Fire Ins. Co. v. Roberts, 226 Ky. 534, 11 S.W.2d 148.

The development of our case law in this field is attributable, in part at least, to the nature of the insurance business and to the nature of the insurance contract itself which is not truly a contract of bargaining, but of adhesion; that is, the insured purchases the contract, prepared solely by the insurer, which the insured seldom reads, but just assumes is what he ordered. The insured buys protection about like he would any other commodity. The terms of the contract are fixed by the insurer, and the bargaining which precedes the execution of the contract usually goes no further than whether the applicant will take it or leave it. The prevailing business custom is for the insured to rely upon the accuracy, skill and good faith of the person who acts for the insurer in filling out the application, delivering the policy, and collecting the premium, and as a consequence the insured seldom reads his policy. For the courts to say that the insured is presumed to know the contents of the application and the policy is to set up a presumption simply contrary to fact. Vance on Insurance, 3rd Ed. (Hornbook) pages 257–259.

On account of the usual failure of the insured to read his policy, the limitations it contained seldom were known to him until it came time to collect on the policy, and for that reason the courts held that many of the limitations contained in policies could have no effect as to transactions prior to the delivery of the policy. As a result the carriers resorted to inserting limitations in the application forms, thus making the signed application the terms of the offer, which, upon acceptance by the insurance carrier, became the terms of the contract to which the insured must necessarily be presumed to have consented, whether the terms of the limitations placed on its agent actually were brought to the insured's attention or not. Vance, pages 456–457. Our case law, as heretofore summarized, reflects this change.

While the insurance carrier, by inserting limitations in its application forms, has thus brought the transaction of obtaining insurance further into the operation of or-

dinary contract law, it has not changed the nature of the applicant who still relies on the agent and is little more likely to read the application form he signs than the policy he gets. Especially is this true when it is the agent who writes in the answers on the application form which the applicant then signs. If the applicant, or his agent, (and not the soliciting agent of the carrier) writes in the answers on the application form, and then signs it or makes his mark, he obviously is bound by it as a matter of contract law.

The ever-increasing variety of insurance offered the public in recent decades by an ever-increasing number of carriers has accentuated the problem of balancing the protection of the carriers from misrepresentations vital to the risks with the need of protecting the honest citizen from the evil incidents of sales methods which intrinsically emphasize commissions for the soliciting agent at the expense of the welfare of the interested applicant. This problem is peculiarly acute, we believe, in the field of nonmedical health and accident insurance where the carrier waives its power to require a medical examination of an applicant before issuing a policy and instead relies on the fidelity of its agents and the honesty of the applicant for its protection against undue risks.

■ In order to effect a better balance between the interests and responsibilities of the carrier and the applicant in the field of nonmedical health and accident insurance, we no longer will place the full responsibility on the applicant as stated in Ky. Central Life Ins. Co. v. Combs, supra, to see that the application is correctly filled out except where the applicant, or his agent, inserts the answers on the application form signed by or for him. Of course if the applicant *knows* that false answers are being put down he will be responsible for them. However, his knowledge of the falsity may depend on how fully he understands exactly what information the application questions seek.

■ The record in the case at bar would warrant the conclusion that the applicant made full disclosures to the soliciting agent of the carrier who considered them too inconsequential to report on the application form, which resulted in the applicant signing the application and the insurance company issuing the policy. Under our statute (KRS 304.656) misrepresentations will defeat recovery on the policy if material or fraudulent. The question is whether there was in fact any misrepresentation in the circumstances of this case. If good faith be found, we think there was not.

According to Couch on Insurance, 2d (1959 Ed.) Section 35:199, "If the insurer's agent, by misleading statements, induces the insured to make false answers and the latter acts in good faith, the insurer is bound * * *. The question whether or not an applicant was, through ignorance and good faith, misled by the agent into believing that his answers were truthful, is for the jury to decide." Metropolitan Life Ins. Co. v. Trunick's Adm'r, 246 Ky. 173, 54 S.W.2d 917 (1932). In Section 35:192 Couch states: "If the insurer's agent construes the questions either by stating what they mean or by specifically stating that certain information is or is not required, any representations which result therefrom are charged to the insurer, the theory being that the insurer's agent remains the insurer's agent although he is assisting the insured." In Sovereign Camp, W.O.W. v. Alcock, 273 Ky. 734, 117 S.W.2d 938 at page 942 (1938) this court, "* * * held the law to be that in the case of insurance contracts it is the fixed rule that the insurer will be estopped to deny liability on a policy if its agent inserts false statements in the written application, or by misleading statements induces the insured to make false answers, if the insured is acting in good faith * * *."

The issue of good faith should be tried.

The summary judgment is reversed for proceedings consistent herewith.

EDWARD P. HILL, STEINFELD, PALMORE, OSBORNE and REED, JJ., concur.

MONTGOMERY, C. J., dissents.

MONTGOMERY, Chief Justice (dissenting).

I respectfully dissent because the decision embodied in the majority opinion, in effect, overrules a long line of decisions, including two very recent ones, Kentucky Central Life Insurance Company v. Combs, Ky., 432 S.W.2d 415, and Paxton v. Lincoln Income Life Insurance Company, Ky., 433 S.W.2d 636, both of which are still in the advance sheets. Both decisions were based on the rule that under KRS 304.656 a misrepresentation that is material or fraudulent bars a recovery. The majority opinion uses as authority a textbook and some obsolete cases.

In Metropolitan Life Insurance Company v. Tannebaum, Ky., 240 S.W.2d 566, the rule under the statute was stated thus:

"Under the section just quoted this Court has uniformly held that a material misrepresentation in an application for an insurance policy, though innocently made, will avoid it and that, although the misrepresentation may not be material, yet if it is fraudulently made by the insured it will, nevertheless, avoid the policy. The Maccabees v. Covert, 302 Ky. 481, 194 S.W.2d 498; Prudential Insurance Company of America v. Lampley, 297 Ky. 495, 180 S.W.2d 399; Business Men's Assur. Co. of America v. Conley, 280 Ky. 375, 133 S.W.2d 554; and Ford v. Commonwealth Life Ins. Co., 252 Ky. 565, 67 S.W.2d 950."

The facts of the present case bring it under the statute and within the long-established rule. McReynolds signed applications for nonmedical accident and health policies, knowing that he had disclosed to the agent that he had had heart disease, high blood pressure, and diabetes. He admits that he knew the agent put false answers of "No" to the questions concerning whether he had had any of those ailments when the true and correct answers should have been "Yes." A summary judgment for the appellant should have been given. The facts are not in controversy.

The opinion seeks to excuse McReynolds by belittling the extent of McReynolds' ailments. Certainly there can be no argument that answers as to whether one has had heart disease, high blood pressure, or diabetes in any degree are material to the risk involved in the kind of policies sought. His knowledge of the wrong answers shows fraud. McReynolds had a severe stroke one month later, rendering him totally disabled.

Such answers are the basis upon which the insurance company is warned of a bad risk and enable it to have a medical examination made to determine the extent of the risk. It is not for the agent or applicant to pass judgment on the sufficiency of such answers. There is a duty of full disclosure so that the company may make an investigation. Under the principle of the majority opinion, any applicant could very well get by with an answer of "No" to the question "Are you pregnant?" if the applicant's answer was, in fact, "A little bit." Obviously this is wrong and is the very thing sought to be guarded against by KRS 304.656 and the line of cases that are now respectively repealed and overruled.

The instability created in the law by such a decision is both deplorable and frustrating. It creates uncertainty in another area of the law. The court should be a steadying influence instead of a disruptive one. If the statute and decisions are so wrong, surely the General Assembly, in its many sessions, could have repealed or amended the statute. It is not the function of this court to do so. In all decency, the court should not overrule cases before they are out of the advance sheets. "The body should be permitted to get cold."

For these reasons I respectfully dissent.