**In re Dan H. MILLER, Faith G. Miller, Debtors.**

**Mark H. Flener, Trustee, Plaintiff,**

v.

**Pacific Indemnity Insurance Company, Defendant.**

**Pacific Indemnity Insurance Company, Plaintiff,**

v.

**Dan H. Miller, Jr., Faith G. Miller, Defendants.**

**Bankruptcy No. 96–41602(1)7. Adversary Nos. 97–4028, 98–4027.**

United States Bankruptcy Court, W.D. Kentucky.

Nov. 17, 2000.

Harry L. Mathison, King, Deep & Branaman, Henderson, KY, for debtors.

Becket & Lee LLP, Malvern, PA, Brian L. Haynes, Owensboro, KY, Alice Barns Herrington, Louisville, KY, Wendell H. Livingston, Malvern, PA, Helen Lucier, Louisville, KY, Andrea Fried Neichter, Louisville, KY, Steven L. Rayman, Kalamazoo, MI, for creditors.

### MEMORANDUM–OPINION

JOAN LLOYD COOPER, Bankruptcy Judge.

This case consists of two separate lawsuits which involve the claim of Dan and Faith Miller (the "Millers") for the total fire loss of their home covered under a homeowners' policy issued by Pacific Indemnity Insurance Company ("Pacific"), one of the Chubb Group of Insurance Companies ("Chubb"), Pacific's defenses to the claim, and Pacific's claim for nondischargeability of sums advanced under the homeowners' policy.

Mark Flener, the duly appointed and acting Trustee for the Millers' bankruptcy estate, filed the action against Pacific for

recovery of the policy proceeds, claiming that it wrongfully denied payment of the proof of loss submitted by the Millers. Pacific claims the Trustee does not have standing to raise these claims since Pacific rescinded the homeowner's policy, leaving no property to vest in the Trustee, upon discovery that the application for insurance omitted material information, which if included would have resulted in a denial of the application for coverage by Pacific, and/or that the fire loss was the result of owner-arson.

This case has a rather circuitous procedural history which is not relevant to this Court's opinion, other than to state that the first action was brought by Pacific to recover amounts advanced under the rescinded homeowners' policy and for a declaration of such sums as a nondischargeable judgment on the basis of the Millers' alleged fraud. Later, the Trustee sued Pacific and E.M. Ford & Company ("E.M.Ford"), the agent that took the Millers' application for an automobile policy and the homeowners' policy, Pacific proceeded as the Plaintiff.

The Court, having considered the pleadings, testimony of the witnesses and documents admitted into evidence relating to the Trustee's claim for recovery under the homeowners' insurance policy, Pacific's defenses thereto and Pacific's claim for nondischargeability against the Millers, hereby makes the following Findings of Fact and Conclusions of Law as required by Fed.R.Bankr.P. 52.

## I. FINDINGS OF FACT

The Millers are married and have two children, Whitney Miller and Trace Miller. In November 1994, the Millers purchased a home at 17 Stone Creek Park, Owensboro, Kentucky. The Millers closed the purchase of the home on November 29, 1994, paying approximately $350,000.

The evidence shows that shortly before closing on the home, Mr. Miller contacted E.M. Ford for the purpose of obtaining homeowners' insurance and automobile insurance. While Mr. Miller knew Steve Ford, a principal of E.M. Ford, for many years and they attended the same church, the Millers had never done business with E.M. Ford prior to this inquiry. Miller spoke with E.M. Ford agent Ann Lovern ("Lovern") about coverage for the new home and after several telephone conversations regarding the coverage needed, Lovern asked Miller to fax her a copy of the declarations page on his current automobile insurance policy with Meridian. Upon receipt, Lovern filled out the insurance application for both the homeowners' and automobile insurance based on the telephone discussions with Dan Miller.

It is undisputed that the homeowners' application filled out by Lovern and submitted to Pacific contained inaccuracies about the Millers' claims history and an earlier cancellation or nonrenewal. However, neither Mr. or Mrs. Miller ever signed the homeowners' application and neither E.M. Ford or Pacific ever provided the Millers with a copy of the homeowners' application or requested them to ratify its contents in writing.

The parties do have a number of disputes, including whether Mr. Miller misled or lied to Lovern on the telephone, whether the inaccuracies were material to Pacific's decision to bind and issue the policy (two different events, the importance of which will become apparent), whether E.M. Ford acted as agent for the Millers or for Pacific for purposes of the binder and issuance of the policy, whether Mr. Miller ratified the information contained in the application and, finally, whether Mr. Miller caused or had caused the fire which consumed his home in the early morning hours on November 9, 1995.

Pacific introduced troubling evidence that in the past the Millers had not properly disclosed their claims history to another local agency and had prior losses, which in and of themselves could lead a reasonable person to question that such a set of unfortunate events could occur to anyone, absent fraud. Cumulatively and by themselves, the Millers' prior claims history seems incredible, yet each occurred and despite the circumstances of Mr. Miller accidentally setting fire to a prior home's garage with a lawn mower, substantial vandalism to one home, which nearly destroyed the interior, several major thefts from automobile and automobile theft claims, Mr. and Mrs. Miller made appropriate police reports of the incidents, the incidents were investigated, no charges were ever filed against them relating to those events, and the various carriers paid their claims.

Further, Pacific introduced troubling evidence that Mr. Miller was an actor in a series of events that led to investors being bilked out of substantial sums of money, and that he was paid his promised commissions for his services when he had reason to know the innocent victims of the crime were not receiving contemporaneous distributions promised to them. Nevertheless, Mr. Miller was not charged with any crime while Frank Deutsche, the principal wrong-doer in the scheme, was charged, plead guilty to securities fraud, and has served or is still serving his sentence.

While these stated circumstances and events do not cover every cloud upon Mr. Miller, they are illustrative of the evidence introduced by Pacific to show that Mr. Miller lacks credibility and it is more probable than not that he would lie to E.M. Ford and Pacific about his prior claims history and later set fire to his home to make yet another incredible insurance claim and reap a windfall. The Court is cognizant of the evidence introduced at

trial and was able to hear the respective witnesses and judge for itself, their credibility. In sum, the Court believes this case must be decided on the issues of owner-arson and agency. If the preponderance of the evidence shows that Mr. Miller caused or had caused the fire which destroyed his home at 17 Stone Creek Park, then under no circumstances should Pacific be required to pay the Millers for the loss, while conversely, if Mr. Miller had no part in the arson, then the Court must determine the agency question. If E.M. Ford was the agent for Mr. and Mrs. Miller at the time of the binder and at the time of the issuance of the policy, the Millers are bound by the inaccuracies in the application. If E.M. Ford was the agent for Pacific at the time of the binder and Mr. Miller did not lie or intentionally mislead Lovern, then Pacific is bound by its agent's negligence in filling out and submitting the faulty application.

### A. *Owner-arson.*

In this posture the Court first addresses the issue of owner-arson. In order to sustain its claim to rescission of the homeowners' policy, Pacific was required to prove by a preponderance of the evidence that the Millers or someone on their behalf intentionally set the fire that destroyed their home. In the early morning hours of November 9, 1995, someone deliberately set fire to four homes in the Stone Creek Park subdivision, causing the total destruction of the Millers' home. With the exception of the point of origin of the fire (and thus whether Mr. Miller caused it), there is little serious dispute about the morning's events.

On the night before and early morning of the fire, all of the Miller family members were at home in bed asleep. Mr. Miller was the only member of the family not in his bed since he fell asleep on the

family room couch watching a movie. The evidence of what happened next is quite voluminous but it can be succinctly summarized. Between 2:30 a.m. and 2:40 a.m., Mr. Miller's dog awakened him with persistent barking at the kitchen door leading to the garage. After opening the wooden door, he saw billowing black smoke through the glass door. He shut the wooden door immediately, ran to the opposite side of this single story ranch to wake his wife, told her to wake their daughter, get the dog and get all of them out of the house while he went to get their son. Mr. Miller then ran back into the kitchen, towards the fire, down the basement stairs to awaken his son who was asleep in his room in the basement. Mr. Miller and his son exited the house by a downstairs door. During all of this, Mr. Miller apparently placed a call to 911 which did not take. Later he called 911 with his cell phone from out on his lawn. While the Masonville Fire Department responded quickly to the call, the first truck did not have fire fighting apparatus and it was nearly 15 minutes before a pumper truck arrived and they began their efforts. In the end, the home was completely destroyed. The other homes targeted that night received minor damage as the fires were easily extinguished before serious damage was done.

Pacific introduced evidence regarding the Millers' motive, opportunity, and the incendiary device used to start the fire at their home. It should be noted that Pacific argues that the other fires were started to make the Millers' fire seem a result of vandalism as opposed to owner-arson, yet it introduced no evidence of any elements of arson respecting those other fires other than the incendiary device used. There is no dispute that charcoal was the primary accelerant used at all four homes. The principal dispute concerns the place of origin of the fire that consumed the Millers' home.

Pacific theorized that if the fire at the Millers' residence started in the locked garage, under the exclusive control of the Millers, then they had the greatest opportunity to cause the fire. Pacific and the Trustee each placed substantial evidence into the record regarding the place of origin of the fire. Pacific used two experts to opine that the fire originated in the garage. The first was Carl Richards of the State Fire Marshall's office, who testified that based upon the burn patterns on the automobiles, the fire started in the trunk of the Mercedes parked in the garage. This testimony conflicts with another official of the State Fire Marshall's office, Carvon Hudson, and Mr. Richard's own written Fire Investigative Report which states that the fire began either at the garage door or in the vehicles in the garage. (See Plaintiff's Exhibit 4). Pacific also introduced testimony from John Hoffman, Ph.D., who opined that the fire must have begun in the garage because of testimony by Mr. Miller regarding flame involvement of the van parked within one foot of the garage door, flames Miller observed coming out of the garage windows when he exited the home, and the rapid burn rate of the fire which resulted in the total destruction of the home within minutes of its ignition. Dr. Hoffman essentially equated the time of ignition with the discovery of the fire.

The Trustee has no theory as to who started the fire except Miller did not start it or cause it to be started and that when it started, it began outside the garage by placement of an incendiary device on one of the van tires and by placing a pile of charcoal against the garage door. The Trustee called Jack Flowers as its expert regarding the place of origin and he stated that the fire definitely started in two places, on the van tire and at the pile of charcoal against the garage. His theory is based upon burn patterns on the driveway

where the van was located, the lack of definite burn patterns (spalling) on the floor of the garage, his understanding that the wind that night was blowing from the rear of the van towards the garage door, and that the attic space over the garage, which ran the entire length of the home, included vents or louvers.

The Court finds Mr. Flowers' testimony to be most credible and persuasive. While Dr. Hoffman has extensive fire design and testing experience, Mr. Flowers has investigated thousands of arson fires in the Commonwealth of Kentucky for many years. He also provided what the Court deemed to be the most plausible explanation for the total destruction of the house. Mr. Flowers more than satisfactorily rebutted Pacific's evidence that the fire began in the trunk of the Mercedes automobile in the garage and that the fire could not have reached the intensity necessary to cause total destruction of the home. If the fire began outside the garage, then the Millers did not have any greater opportunity than anyone else to start it.

To shore up the paucity of even circumstantial evidence supporting a finding that Mr. Miller caused or had caused the fire at his home, whether in the garage or outside, Pacific introduced testimony from a number of neighbors and the respective authorities responding to and investigating the fires. While Pacific points to evidence of odd behavior by Mr. Miller on the evening before and the morning of the fire, the evidence introduced at trial showed that on the morning of the fires, Dan Miller consented to a search of his home. About one week after the fire, he also submitted to a lengthy interview by the Kentucky State Police without counsel.

The Court has reviewed the extensive evidence and notes that little if nothing about that night in Stone Creek Park was normal. As if four distinct arson fires on the same sleepy, well-to-do-street in one night were not strange enough, Pacific introduced into evidence documents from the files of the Masonville Fire Department, the Kentucky State Police and the Daviess County Sheriff's Office, admitted as Pacific's Exhibits 5, 6 and 7, which indicate far stranger incidents than Mr. Miller seeming upbeat the night his home was destroyed. While this list is by no means exhaustive those documents indicate the following: (1) at approximately 1:30 a.m. on that morning, one of Millers' neighbors reported seeing a beige car, in the neighborhood, with two unidentified people inside smoking. Investigators later discovered empty cigarette packages in the area; (2) another neighbor saw an unidentified man walking in the neighborhood on the morning following the fire; (3) Gene Bowlds, a neighbor living on the same street but at some distance around a bend in the street, reported to the Masonville Fire Department that he was awakened that evening by a possible intruder in his home. Mr. Bowlds also place a 911 call at 2:49 a.m.; (4) Another neighbor, Donald Gipe, gave a statement to police that states, among other things, "A neighbor, Gene Bowlds, had been on the way to the Millers' house, and had seen Gipe's garage door on fire in the car's rearview mirror, and thought it was a reflection of the Millers' fire . . ."

The Court finds it strange given the time lines of the various events described by numerous witnesses that a neighbor around the corner would be awakened by noises like an intruder, call 911 and then wind up in his car on his way to the Millers' home. Perhaps it can be explained by the manifestations of the intensity of the fire at that point, yet the Court is convinced that during the early morning hours of November 9, 1995, a plethora of inexplicable events occurred in this otherwise peaceful neighborhood.

Further, Pacific never provided any testimony or evidence that Mr. Miller could have physically accomplished the task committed that night in that neighborhood, which by anyone's estimation based upon the layout of the large yards and homes and the timing of the fires would have required an extraordinary logistical achievement and strenuous effort by any person. This Court finds that it is unlikely at best that Mr. Miller could have successfully undertaken the activities required that night to cause all of the fires. Again, Pacific made no showing of any other person working under Mr. Miller's control or at his suggestion that could even give rise to this Court making this inference. It is significant that there are many unanswered questions and unexplained events of that evening, much of which does not even directly involve the Millers.

The Court takes special note that Mr. and Mrs. Miller's wedding pictures and some other valuables were stored in a shed on the property that was not damaged by the fire. While this fact alone is enough to warrant suspicion, the Court found Mrs. Miller's testimony, that the boxes in which those items were stored had been in the shed since they moved into the home, credible and persuasive. It is also significant that no one, including the Millers, was ever charged with a crime from the events of that night.

The Court was unpersuaded by Pacific's evidence to the effect that the Millers' financial condition was so bad that Mr. Miller would destroy his home. First, while the Millers did not have a great degree of liquidity at the time of the fire, Mr. Miller had maintained the family for a long period of time as his income sagged and Mrs. Miller was still earning more than enough money from teaching to feed the family. Second, Mr. Miller had little to gain from burning down his home and destroying his cars particularly because there was some evidence that the late model Mercedes was unencumbered. The Pacific homeowners' policy was a repair or replace policy. The $300,000 in equity he had in the home would not go in his pocket under any circumstances. In so far as the contents, the Court finds it implausible that Mr. Miller would destroy his home and automobiles to get cash flow from the proceeds of the policy for the contents of the home, the unencumbered vehicle, and for living expenses. It is clear that at the time of the fire, Mr. Miller had reason to believe that the impediments to the sale of his home and use of his line of credit due to a wrongly lodged lien on his home were at least partly removed and that the settlement already agreed to would free the home up for sale, if necessary.

### B. *Agency.*

At this point, the Court shall turn its attention to the agency issue. Pacific sought to have the homeowners' policy rescinded based on material inaccuracies in the application. The Court must first determine under the facts whether Lovern was the agent of Pacific or the agent of the Millers and then if she was the agent for Pacific, who was responsible for the inaccuracies.

On this point Pacific introduced a copy of the homeowners' policy and the Agency Agreement between Chubb, Pacific's parent, and E.M. Ford. E.M. Ford had signed an Agency Agreement with Chubb that was in effect at the time the homeowners' application was received by Lovern and submitted to Pacific. The Agency Agreement set forth E.M. Ford's authority as follows:

Applications.

You may receive applications for insurance risks you are licensed to solicit (as authorized in the addenda attached to this Agreement), and submit them to us

for approval. You may bind insurance only as authorized by attached addenda, or by other authority delegated by us. This authority is subject to the laws and regulations and to instructions provided by us from time to time.

Pacific admits in its post-trial brief, as it must given the terms of the Agency Agreement, that E.M. Ford was its agent for solicitation and issuance of a binder of insurance. Further, a clear reading of the Agency Agreement indicates E.M. Ford was authorized to receive applications for risks they were licensed to solicit and submit to Chubb. Pacific, however, makes a distinction between agency for the purposes of the binder and agency for the purposes of issuance of the policy, both of which require completion of the application.

At trial, the evidence showed that on November 28, 1994, Lovern faxed a note to Maureen Eggleton of Chubb stating, "We have coverage bound on Mr. Miller's $350,000 home effective 11–28–94." The homeowner's application, however, was not actually sent to Pacific by Lovern until the next day, November 29, 1994, the date that Miller met with Lovern at the agency to sign the automobile insurance application. Lovern told Miller by telephone that coverage on the home had been bound on the afternoon of November 28, 1994. She also stated she had to submit the application to Chubb to get the rate, but that the insurance coverage was bound.

The Trustee argues that Pacific/Chubb did not rely on the information or omissions of information in the application since coverage was bound before Chubb's underwriters could make a decision on coverage. Pacific introduced evidence that the information contained in or omitted from the application was material to its acceptance of the risk in issuing the policy. The Court accepts this testimony.

Finally, the Court turns to what occurred between Mr. Miller and Ms. Lovern. The parties agree that conversations between the two occurred primarily by telephone and that all information used to prepare the application was received over the phone and with the help of the declarations page of the Millers' automobile policy. The essential dispute focuses on whether Lovern asked Mr. Miller the questions contained in the homeowners' policy that was tendered to Pacific/Chubb and then marked the answers correctly.

Lovern testified that she asked Miller for information relating to the automobile policy and that Miller told Lovern, that his wife had been involved in a no fault automobile accident. Lovern made notes of the discussion on the facsimile transmittal sheet of Miller's declarations page from the Meridian policy. Lovern also told Miller she could get a better rate on the insurance if she submitted both applications together for a rate quote.

The homeowners' application requested prior claims information for a five year period. The auto application asked for a prior claims history of only three years. The homeowners' application included the following two questions:

Any Property or Liability Claims in the Past 5 Years?

Has Any Coverage Ever Been Cancelled or Non–Renewed?

The "no" box next to each question was checked. Both answers were incorrect. The answer to the first question was wrong for two reasons. Just beyond three (3) years prior to the date of the application, the Millers had submitted a claim and were paid a substantial sum by the prior carrier under their homeowners' insurance for property damage to their home located on Secretariat Drive which had been caused by vandals. The Millers had also made a claim and were paid another sub-

stantial sum by a prior carrier in March of 1994 for theft from an auto owned by Dan Miller that occurred while the vehicle was parked at a hotel in Nashville, Tennessee.

Lovern, who did not appear at trial but testified by deposition, stated she had no specific recollection of having asked Miller whether he had claims in the past five years, but that her normal practice was to ask the questions that are on the application. She testified it was her "belief" that she asked those questions.

The Court finds it significant that Ms. Lovern does not recall specifically asking each question on both applications. Miller testified that he did not tell Lovern about the vandalism to his home on Secretariat because it occurred prior to the three years she asked him about. He also testified he told Lovern about the Nashville break-in, but testified that Lovern stated "car claims don't count." There is no testimony or evidence that Lovern probed Miller any further about this claim. Lovern did not list it or provide that information on the application she submitted to Pacific.

The homeowners' application also incorrectly states that the Millers had not had any insurance cancelled or nonrenewed. In fact, the Millers' homeowners' insurance had been nonrenewed because the property to be insured was vacant. Miller testified that Lovern did not ask him about cancellations or renewals.

Both Miller and Lovern's testimony is consistent that Miller did not review the homeowners' application or sign it. Further, at no point during the process, either upon the securing of the binder or the issuance of the policy of insurance, did Pacific require Miller's review or signature on the homeowners' insurance application. Miller did meet with Lovern at E.M. Ford on the day after Thanksgiving in 1994, which was the same day the Millers closed on the Stone Creek property. Lovern tes-

tified that she showed Miller the homeowners' application, and told Miller he did not need to sign it. She then gave him the automobile insurance application which he reviewed and signed. This is consistent with Miller's testimony. There was no testimony from Lovern that Miller read the homeowners' application and Miller testified that he did not read it.

After the fire, the Millers submitted proofs of loss to Pacific in the amount of $680,634.05, plus an undetermined claim for loss of use. Pacific paid $21,725.00 for debris removal, $31,287.16 for personal property replacement and $19,850.00 to the Millers for living expenses. Pacific ultimately denied the unpaid claim of $607,771.89 contending the loss was caused by owner-arson excluding coverage under the homeowners' policy. Vigilante Insurance Company, the company that had insured the automobiles, paid $89,272.21 under the automobile insurance policy. Pacific filed a Proof of Claim in the Millers' bankruptcy, but Vigilante has not filed a Proof of Claim in this bankruptcy. Just prior to trial, Pacific moved to amend its Complaint to include recovery for sums paid by Vigilante on its automobile policy for the four (4) automobiles destroyed the night of the fire.

## II. CONCLUSIONS OF LAW

### A. Owner–Arson.

In order to justify its rescission of the homeowners' policy on its defense of owner-arson, Pacific needed to prove by a preponderance of the evidence that the Millers or someone on their behalf brought about the destruction of their property by fire. *Westchester Fire Ins. Co. of New York v. Bowen*, 219 Ky. 41, 292 S.W. 504 (1927). In a civil trial, the proponent of an arson theory must show evidence of motive, opportunity and the use of an incendiary device. *Arms v. State*

*Farm Fire and Casualty Co.,* 731 F.2d 1245, 1249 (6th Cir.1984). Kentucky courts have recognized that arson cases are typically difficult to prove and in civil cases, may therefore, be established by circumstantial evidence. *Twin City Fire Ins. Co. v. Lonas,* 255 Ky. 717, 75 S.W.2d 348, 350 (Ky.1934). The fact that circumstantial evidence may be used does not relieve Pacific from its burden of proof. Circumstantial evidence must do more than suggest liability as a matter of conjecture, surmise or speculation. *City of Louisville v. LaFollette,* 470 S.W.2d 599, 600 (Ky.1971).

■■■■ Circumstantial evidence must go far enough to induce reasonable conviction that the facts sought to be proved are true and must tend to eliminate other rational theories. *Id.* "It is an inference of a fact from other facts proved, and the fact thus inferred and assented to by the mind is said to be presumed, that is, it is taken for granted until the contrary is proved." *Twin City Fire,* 75 S.W.2d at 350, quoting *Perry's Adm'x v. Inter–Southern Life Ins. Co.,* 248 Ky. 491, 58 S.W.2d 906, 907 (1933).

■■■ The Court concludes based upon the evidence presented at trial that Pacific failed to carry its burden of proof on this issue. While the fire was started by use of an incendiary device and the Millers had the opportunity to set the fire, the Court finds that due to the origin of the fire at the van and the garage door, this opportunity was no greater than any other person in the area that night. Further, the preponderance of evidence rebutted the circumstantial evidence presented by Pacific, particularly regarding opportunity and motive, establishing that it was more likely than not that this was not a case of owner-arson.

The evidence established that on the evening of November 9, 1995, four fires were set in the Stone Creek Subdivision. Pacific argues that Dan Miller started the fire at his home because it alleges the fire started in his locked garage and he had the exclusive opportunity to cause a fire of that destruction. On this point, Pacific relies on Dr. John Hoffman's testimony, a fire engineer, and Carl Richards, a fire investigator in the state fire marshal's office, both of whom opined that the main fire began in the garage. Neither of these gentlemen are classic arson investigators, however. The evidence presented by the Millers through Jack Flowers, a career fire investigator and arson unit supervisor with well over 10,000 fire investigations, is more plausible as to how the fire began and the reason for its swift destruction of the home. In short, Pacific's circumstantial evidence of opportunity was effectively rebutted with credible and persuasive evidence that tended to prove that Miller had no greater opportunity to start the fire than anyone else in the area that night.

The Court is also convinced that there were other unidentified people in the vicinity around the time of the fire and suspicious circumstances that override the suspicious background of the Millers. Neighbors had noted strangers in the neighborhood on the early morning prior to the fire, on the morning following the fire and one neighbor was apparently awakened by an intruder in his home. (See Plaintiff's Exhibit 5). None of these leads appear to have been vigorously pursued by the investigating authorities and no conclusions to those suspicious events were evidenced in testimony or the Kentucky State Police file. This Court concludes that the preponderance of the evidence did not establish a motive on the part of the Millers to commit arson. It makes no sense from any perspective for the Millers to set fire to a house in which the entire family was asleep, risking serious injury or death. Pacific did not carry its burden of proof that the level of the Millers' debt was so overwhelming as to

overcome Mr. Miller's sense of survival and that of his family. Further, the evidence of Mrs. Millers' teaching income, the equity in the home, one unencumbered automobile, and settlement of the lawsuit regarding the wrongful lien on the home all mitigate against owner-arson. Finally, the Court notes that the homeowners' policy was for repair or replacement of the structure and would not have resulted in a financial windfall for the Millers as Pacific argues. While the Millers received living expense money from Pacific after the fire, such funds would not have been necessary in the absence of the fire. The Millers would have received funds to replace personal items destroyed in the fire, but there is no indication that they would have not replaced those items. In other words, the windfall did not exist and there were numerous, reasonable, less drastic solutions available to the Millers' debt problems than arson.

### B. *Agency.*

▪▪▪ Pacific also rescinded the homeowners' policy on the basis of alleged material inaccuracies by Miller in the application process. In order to prevail on this argument, Pacific needed to establish that E.M. Ford acted as agent for the Millers or that Mr. Miller made material misstatements of fact when providing information to Lovern on the telephone. The Court first determines that E.M. Ford was the agent for Pacific/Chubb in the application, binder, and policy issuance process.

In determining whether a party is an agent for an insurer, it is necessary to consider the facts and circumstances of each case. No one factor is determinative of the agency issue. 3 Lee R. Russ, et al, *Couch on Insurance 3D* § 44.46 (1997). All parties agree that E.M. Ford and its agents' authority was governed by the Agency Agreement. With respect to applications, the Agreement provides:

> You may receive applications for insurance risks you are licensed to solicit (as authorized in the addenda attached to this Agreement), and submit them to us for approval. You may bind insurance only as authorized by attached addenda, or by other authority delegated by us. . . .

The Court notes that neither party submitted the "attached addenda" referenced on the authority to bind so the Court will interpret the document on its face. Under the Agency Agreement, Lovern had full authority to solicit, receive the application, and bind insurance. This is precisely what she did in this case. In fact, Lovern notified Pacific on November 28th, the day before Miller met her at the E.M. Ford Agency to sign the automobile insurance application, that coverage was bound. Lovern stated in her fax to Maureen Eggleton of Chubb, "We have coverage bound on Mr. Miller's $350,000 home effective 11–28–94." Pacific never challenged Lovern's authority to bind.

Kentucky courts have placed great weight on the fact that an agent has the authority to bind in determining the capacity of an agent. In *Cincinnati Insurance Co. v. Clary,* 435 S.W.2d 88 (Ky.1968), the court held the homeowners' insurance company liable under the provisions of a fire insurance policy binder. The company contended that it was not liable under the policy because the agent had not notified the company that the coverage had been placed with it. The court determined first that the insurance broker was a general agent for the company based on the written Agency Agreement between the agency and the company which provided the agent with authority to receive and accept applications and issue binders without prior consideration and approval of the company. The court in *Clary* placed great emphasis on the fact that the agent had the authority to accept the application and

bind insurance without prior approval of the company. Similarly, in this case, Lovern did not need prior approval of Pacific to bind coverage for the Millers.

Pacific states that E.M. Ford only had the authority to receive applications. On this point Pacific states in its brief, "the authority to bind was also subject to the subsequent approval of Chubb." (Brief of Pacific, p. 12). Actually, the Agency Agreement provides it is the application that is subject to approval. The authority to bind is not so limited by the Agency Agreement. In fact, it states that the authority to bind is as "authorized by attached addenda, or by other authority delegated by us." It is the authority to bind along with the fact that Pacific did not require prior review of the application by the insured, the insured's signature or any subsequent affirmation of the contents of the application or even review of same that leads the Court to conclude, as in *Clary*, that Lovern was Pacific's agent and not Miller's agent during the application process.

While a finding of agency for the insurance binder process may not require a finding of agency for the policy issuance process, a change of agency status, *i.e.*, from E.M. Ford as agent for Pacific to agent for the Millers, requires some subsequent event, such as Pacific's requirement that the Millers provide it written ratification of the application, or special pre-existing factual conditions or circumstances, such as a long-standing agency relationship between the Millers and E.M. Ford. No such circumstance exists in this case.

KRS 304.9–020 provides further support for the Court's finding on agency. The statute states:

> An "agent" is an individual, firm, partnership, limited partnership, corporation, or limited liability company appointed by an insurer to solicit applications for insurance or annuity

contracts or to negotiate insurance or annuity contracts on its behalf, and if authorized to do so by the insurer, to effectuate and countersign insurance contracts.

The Agency Agreement authorized Lovern to solicit applications and bind insurance. Kentucky provides for the liability of insurers for the acts of its agents as follows:

> Any insurance company shall be liable for the acts of its agents when the agents are acting in their capacity as representatives of the insurance company and are acting within the scope of their authority.

KRS 304.9–9–035. Clearly, filling out Miller's application for submission to Pacific was within the scope of Lovern's authority, a fact never questioned by Pacific.

Pacific relies on *J. Inmon Insurance Agency, Inc. v. Kentucky Farm Bureau Mutual Ins. Co.*, 549 S.W.2d 516 (Ky.App. 1977), in support of its claim that Lovern was a broker, not an agent and should, therefore, be considered a broker for the insured and not the insurer. *Inmon*, however, clearly states that the general rule that brokers are the agents of the insured applies "in the absence of statutory or some special indicia of authority ..." *Id.* at 518. The authority to solicit applications and to bind Pacific to coverage on an unsigned and unreviewed application, make Lovern the agent of Pacific, rather than the Millers. This finding is consistent with Kentucky judicial opinions that place the burden for errors such as the ones in this case on the company whose agent took the application. *See Motorists Mut. Ins. Co. v. Richmond*, 676 S.W.2d 478, 481 (Ky.App.1984).

■ Pacific's attempts to disclaim liability for Lovern's actions because the Agency Agreement provides that Ford is an independent contractor, does not change the Court's findings. Limitations

on an agent's authority or status are not effective against innocent third parties who had no knowledge or notice thereof. *See* 3 Lee R. Russ, et al., *Couch on Insurance 3D* § 48:27 and 48:28 (1997) and *Kentucky Macaroni Co. v. London & Provincial Marine & General Ins. Co.*, 83 F.2d 126, 128 (6th Cir.1936). There is nothing in the policy or the application, even if Miller had reviewed it, that would have alerted him to this limitation on Lovern's capacity.

At one time the general rule in Kentucky was that as between the applicant and the insurance company it was the applicant's responsibility to see that the application was correctly filled out. *See Paxton v. Lincoln Income Life Ins. Co.*, 433 S.W.2d 636, 638 (Ky.1968). Subsequent to *Paxton*, Kentucky's highest court stated that it would no longer place the full responsibility on the applicant to see that the application was correctly filled out, "except where the applicant, or his agent, inserts the answers on the application form signed by or for him." *Pennsylvania Life Ins. Co. v. McReynolds*, 440 S.W.2d 275, 277 (Ky.1969). The application at issue was not filled out by the applicant or his agent, nor was it signed by or for him.

Pacific's reliance on *State Farm Mutual Automobile Ins. Co. v. Crouch*, 706 S.W.2d 203 (Ky.App.1986), is also misplaced. In that case, coverage under a binder was denied where the insured made misrepresentations in the application. The court held the insured was responsible for the inaccuracies where she had signed the application and had supplied inaccurate information on the insured's driving record. Here, Miller did not sign or have an opportunity to review the application before coverage was bound. Further, the inaccuracies were not a result of the insured's affirmative misstatements.

The Court now turns to whether Miller made material inaccuracies of fact to Lovern upon which Pacific relied. If Miller

made such material inaccuracies to Pacific's agent, then Pacific's defense that the homeowners' policy was rescinded should be sustained. The Court finds, however, that the evidence presented at trial established that the inaccuracies in the application resulted from the manner in which Lovern gathered for the application, filled out the form, and submitted it to Chubb.

Lovern's testimony was basic and nonspecific as to the questions she asked Miller in the application process. Her deposition testimony established that she did not have a specific recollection of asking Miller each question, but only that it was her customary practice to do so. The Court also finds it significant that Lovern asked Miller for information on the automobile insurance application at the same time as the homeowner's application. The automobile application only asked for a claims history of three years as opposed to five years.

If Miller acted in bad faith, errors in the passage of information should be construed against him since an applicant's good faith is an issue that should be reviewed. *Osborne v. American Select Risk Ins. Co.*, 414 F.2d 118, 121 (6th Cir. 1969). Under the facts and evidence presented, the Court concludes that Pacific failed to establish that Dan Miller acted in bad faith during the application process. He informed Lovern of the Meridian claim, but Lovern decided not to pursue the matter further and told him simply that "car claims don't count." Without being required to review and sign the application, the Court cannot hold Miller responsible for inaccuracies contained therein. Had Pacific had in place a procedure assuring that a potential insured reviewed and authenticated the accuracy of the application, as was required by Vigilante, the result would have likely been different.

Based on the testimony of both Lovern and Miller, the Court concludes that Miller

did not provide Lovern with false information, rather that Lovern either asked only for a three year claims history or neglected to ask the question at all and answered it herself incorrectly. The quality of Lovern's testimony also leads the Court to conclude as Miller testified that Lovern did not ask him for information on cancellations or nonrenewals. The Court was in a position to evaluate Mr. Miller's credibility in person over several hours of testimony and cross-examination. The Court found his demeanor and the substance of his testimony credible. The Court did not have a similar opportunity with respect to Lovern, yet each party was satisfied with using her deposition as dispositive on the substance of her knowledge.

Since Lovern was acting as Pacific's agent during the application process, her acts are attributable to Pacific and it cannot rescind and thus void the policy.

Pacific makes much of statements made by the Millers' counsel in closing arguments that Miller "didn't come in to review the application until the next day, November 29th." (Tr. at 199). Pacific contends that this statement constitutes an admission that Miller reviewed the application before it was submitted to Pacific. Miller's testimony on this point was unequivocal that he did not review the application. He testified as follows:

> I went into the office, and Ms. Lovern had a stack of papers in a folder and opened it up, looked at the first one and said, 'It is the homeowners'. You don't need to sign that. 'Put it over here.' She said, 'Here's the automobile policy. Sign it right there.' We did that.

(Tr. at 191).

While an admission of counsel during trial is binding on the client, any such "admission" when taken in context, must be clear, deliberate and unambiguous. *MacDonald v. General Motors Corp.*, 110 F.3d 337, 340 (6th Cir.1997). The Court

does not construe the Millers' counsel's statement as a clear, deliberate, unambiguous statement equaling such an admission. Millers' counsel's statement was made in an effort to emphasize the fact that coverage was bound before Mr. Miller met with Lovern at the E.M. Ford Agency and before she even sent the application to Pacific. Miller saw the application when he signed the auto application but he did not review it in the sense that he read each and every question and answer. It is important to note that Lovern's testimony does not conflict with Mr. Miller's testimony on this point. Thus, the Court rejects Pacific's argument that Miller ratified the acts of Lovern.

Therefore, the Court finds in favor of the Trustee on his claim to coverage under the homeowners' policy and disallows Pacific's defense that the homeowners' policy was rescinded on the basis of owner-arson and/or material misrepresentations of fact in the insurance application. Pacific's claim for nondischargeability is dismissed. The Court denies the motion to amend the complaint to include the claims of Vigilant, consistent with its rulings herein.

By separate Order, the Court will schedule a pretrial conference on the Trustee's claim against Pacific for bad faith in failing to settle this claim.

### III. CONCLUSION

For the above stated reasons, Judgment will be entered for the Trustee in the amount of $607,771.89 plus interest and against Pacific Indemnity Insurance Company on its claim to have the debt declared nondischargeable. The Court has entered a judgment of this same date incorporating by reference the findings of this Memorandum–Opinion.